823 F.2d 189
 17 Collier Bankr.Cas.2d 363, Bankr. L. Rep. P 71,898
In the Matter of Wayne Rodney LINDSEY and Margaret A. Lindsey, Debtors:
Wayne Rodney LINDSEY and Margaret A. Lindsey, Plaintiffs-Appellants,
v.
FEDERAL LAND BANK OF ST. LOUIS; and United States of
America acting through Farmers Home
Administration, a division of the United
States Department of
Agriculture,
Defendants-
Appellees.
In the Matter of Louis Patrick KNESS, Debtor:
Louis Patrick KNESS, Plaintiff-Appellant,
v.
FEDERAL LAND BANK OF ST. LOUIS and Bank of Viola,
Defendants-Appellees.
 Nos. 86-2658, 86-2659.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 6, 1987.
Decided July 6, 1987.
 
 Carl F. Reardon, Reardon & Orr Ltd., East Peoria, Ill., for plaintiffs-appellants.
 Gerald D. Fines, U.S. Atty., Springfield, Ill., Douglas R. Lindstrom, West Neagle & Williamson, Galesburg, Ill., for defendants-appellees.
 Before CUMMINGS, CUDAHY, and POSNER, Circuit Judges.
 POSNER, Circuit Judge.
 
 
 1
 Section 506(a) of the Bankruptcy Code, 11 U.S.C. Sec. 506(a), provides that "an allowed claim of a creditor secured by a lien on property in which the [bankrupt] estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property," and beyond that is an unsecured claim. Section 506(d) provides (with immaterial exceptions) that a lien which is not an allowed secured claim is void. The combined effect of these subsections is to "strip down" a lien to the value of the security. The question for decision (one of first impression at the appellate level) is whether these provisions can be used to prevent the creditor from foreclosing his "stripped down" lien.
 
 
 2
 The appeals are from decisions by the district court affirming the denial of two adversary claims arising from the Chapter 7 bankruptcies of Mr. Kness and of Mr. and Mrs. Lindsey, respectively. The facts of the Lindseys' claim are illustrative. The Lindseys were hog farmers who owned real estate that was subject to a first mortgage of $209,000 held by the Federal Land Bank of St. Louis and a second mortgage of $341,000 held by the Farmers Home Administration. The loan by the Farmers Home Administration was secured primarily by the Lindseys' farm equipment, the second mortgage on the real estate merely providing some additional collateral.
 
 
 3
 Hog prices fell drastically in the early 1980s. The Lindseys couldn't make ends meet. They defaulted on the mortgages (which thereby became due and payable in full, by their terms), and shortly afterward filed for bankruptcy under Chapter 7 of the Bankruptcy Code (liquidation), 11 U.S.C. Secs. 701 et seq. A trustee was appointed, but he abandoned the bankrupt estate when it became evident that there would be nothing for the unsecured creditors. The Lindseys asked the bankruptcy judge to "strip down" the mortgages to the current market value of the real estate. The banks argued, unavailingly, that 11 U.S.C. Sec. 506 does not apply to liens on real estate; they have wisely abandoned the argument. See 3 Collier on Bankruptcy p 506.07, at p. 506-71 (15th ed., King ed., 1987). The bankruptcy judge found the current market value of the real estate to be $233,000, so that all of the Federal Land Bank's first mortgage but only $24,000 of the Farmers Home Administration's second mortgage was secured. The judge gave the Lindseys 30 days to redeem their property by paying the two lenders $233,000, failing which the lenders would be entitled to enforce their liens (up to the new valuation) by foreclosure proceedings. Instead of redeeming, the Lindseys appealed the judge's order to the district court. When they failed to post the appeal bond set by the bankruptcy judge, he lifted the automatic stay which was protecting the bankrupt estate from suit. The lenders then began foreclosure proceedings, which were still in progress when the appeal was argued to us. In their appeal to the district court the Lindseys contended that the bankruptcy judge should have let them continue making the monthly payments specified in the first mortgage and should have established a payment schedule for the stripped-down second mortgage. The district court disagreed with them and affirmed the bankruptcy judge.
 
 
 4
 The presence of the mortgagees in the bankruptcy proceeding requires comment, in view of the old saw (which, as this case shows, is no better than a half-truth) that liens pass through bankruptcy unaffected. See, e.g., In re Tarnow, 749 F.2d 464, 466 (7th Cir.1984). A lienor need not, in order to enforce his lien, file a claim in his debtor's bankruptcy proceeding, though if he does not he loses the chance of enforcing any deficiency judgment against the assets of the bankrupt estate. Since the Lindseys had no assets other than those secured by the mortgages, the mortgagees had no incentive to seek a deficiency judgment, hence no incentive to file a claim in bankruptcy. If, therefore, liens truly passed through bankruptcy unaffected, the mortgagees would not have been dragged into the bankruptcy proceeding at all, since they were content to foreclose on their liens. But then how are sections 506(a) and (d)--provisions that apply only to liens, and hurt the lienor--ever brought into play? One possibility is that they are brought into play only when the lienor, wanting to have an unsecured claim against the bankrupt estate to the extent of any difference between the value of his lien and the amount of money owed him by the debtor, has voluntarily filed a claim in bankruptcy. This interpretation, which makes section 506 merely an optional creditor's remedy, is consistent with the notion that liens pass through bankruptcy unaffected, but overlooks the significance of section 506(d) when read together with section 501, which governs proof of claims. Section 501(c) authorizes the debtor as well as the creditor to file a proof of claim, including proof of a secured claim under section 506(a). Such a filing not only drags the secured creditor into the bankruptcy proceeding against his will but brings section 506(d) into play, that is, strips down the lien, even if the lienor would have preferred to bypass the bankruptcy proceeding completely. Often (and here) the debtor simply files an adversary claim against the lienor without bothering to file a formal 501 proof of claim. Although there doesn't seem to be a statutory basis for such a procedure, the lienors in this case have not objected to it, so neither shall we. See generally 3 Collier on Bankruptcy, supra, p 506.07.
 
 
 5
 So the liens were stripped down. But once the stripdowns were complete and the secured claims allowed in their stripped-down amount, and given that only the two stripped-down creditors were in the picture (for they were senior, and there were not enough assets for junior creditors to get anything), the only thing that remained to do in the bankruptcy proceeding was to discharge the debtors and let the creditors foreclose their stripped-down liens, subject to whatever rights of redemption the debtors might have, under state law, in the foreclosure proceedings.
 
 
 6
 The Lindseys forget that they chose to proceed under Chapter 7 of the Bankruptcy Code, which contemplates the liquidation of the bankrupt estate. The real estate is the only asset of the estate; liquidation of the estate means sale of the real estate. Nothing in section 506 suggests the contrary. If the Lindseys wanted to hold on to their property they should have sought reorganization under Chapter 13. In a reorganization, secured creditors may be prevented from foreclosing; may be forced to substitute a new security interest for their original interest; may experience, in short, the terrors of "cram down" (if necessary to protect junior or unsecured creditors, but that is not a consideration here). See 11 U.S.C. Secs. 1325(a)(5), 1327. There is no cram down in a liquidation. Liquidation is liquidation.
 
 
 7
 It would be absurd to think that Chapter 7 could be used, as the Lindseys and Kness would use it, just to reduce the amount due on a mortgage. Then in any period of depressed real estate values, when a farmer's liabilities exceeded his assets, he could get the liabilities reduced simply by declaring bankruptcy. Hog prices have risen lately, and the Lindseys' counsel stated at argument that the Lindseys are making money hand over fist. Probably their real estate has increased in value, too, since the value of farm land is in major part a function of farm income. This rise in value might have enabled them to redeem but should not allow them to hold on to mortgages on which they have defaulted.
 
 
 8
 The main purpose served by section 506 is to put the secured creditor who chooses to pursue his rights in bankruptcy in the same position that he would occupy if he had decided to bypass bankruptcy. If such a creditor bypassed bankruptcy and foreclosed his lien, he would obtain the market value of the interest secured by the lien and a deficiency judgment for the rest. Section 506 gives him a secured interest that he can foreclose on equal to the market value of his interest, and makes him an unsecured creditor for the rest, which is all that a judgment creditor is anyway. The statute is not intended to put him in a grossly inferior position to what he would occupy outside bankruptcy, by denying him all rights of foreclosure after the debtor has defaulted and the lien has been written down.
 
 
 9
 What the statute does for the debtor (through the interaction of sections 506 and 501) is enable him to precipitate the foreclosure proceedings, which he might want to do, if real estate prices were temporarily depressed, in order to minimize the secured claims and thus increase the amount available for the unsecured creditors. This presupposes a case in which the trustee is standing in the debtor's shoes and representing the unsecured creditors, rather than a case such as this where the debtor is simply trying to shield as much of his property as possible from the only creditors who are pursuing him. Another reason for the debtor's wanting to precipitate foreclosure, however, is fear that a lienor might hang back till the debtor had been discharged, and then foreclose and obtain a deficiency judgment. This tactic might impede the debtor's "fresh start"; section 506(d), read together with section 501(c), enables the debtor to scotch the tactic. In either situation, though, all the debtor can do is accelerate the foreclosure; he cannot postpone it, let alone (as the debtors in this case seek to do) prevent it.
 
 
 10
 The current financial difficulties of many of the nation's farmers have created pressure for liberal interpretation of the bankruptcy laws, but the interpretation sought by the Lindseys (and Mr. Kness, who as we said earlier is in the same boat) exceeds the bounds of liberality. There is a strong argument that liberal interpretations of bankruptcy law do not even help farmers, or any other class of debtors, in the long run--that the fewer the rights that creditors have in bankruptcy the higher interest rates will be, because defaults will be more costly to creditors. And interest is paid by debtors. Analysis would be more complicated if the issue were not debtor versus secured creditors, but trustee, representing the unsecured creditors, versus secured creditors; for then higher interest rates on secured debt might be offset by lower interest rates on unsecured debt, leaving debtors' net burdens unchanged. But this case pits the debtors themselves against the only creditors in the picture, who happen to be secured.
 
 
 11
 AFFIRMED.