949 F.2d 585
 25 Collier Bankr.Cas.2d 1393, Bankr. L. Rep. P 74,350
In re PCH ASSOCIATES, formerly known as Simon Associates, Debtor.
LIONA CORPORATION, INC., Plaintiff-Appellant,
v.
PCH ASSOCIATES, formerly known as Simon Associates,
Westinghouse Electric Corporation, Nico
Construction Company, Inc., Defendants,
PCH Associates, formerly known as Simon Associates,
Defendant-Appellee.
 No. 1302, Docket 90-5086.
 United States Court of Appeals,
Second Circuit.
 Argued April 15, 1991.
Decided Nov. 19, 1991.
 
 David T. Eames, New York City (Neal A. DeYoung, Bodian & Eames, of counsel), for appellant.
 Marc S. Kirschner, New York City (Thomas L. Abrams, Craig S. Gatarz, Jones, Day, Reavis & Pogue, of counsel), for appellees.
 Before MESKILL, PRATT and WALKER, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 Liona Corporation, Inc. (Liona) appeals from an unpublished order of the United States District Court for the Southern District of New York, McKenna, J., entered on December 4, 1990, 122 B.R. 7 affirming an unpublished decision of the United States Bankruptcy Court for the Southern District of New York, Blackshear, J., in favor of the debtor, PCH Associates (PCH). The district court concluded that the "law of the case" doctrine barred Liona's action to enforce its rights in certain property held by PCH. While we agree that the district court properly applied the "law of case" doctrine, we believe that our prior decision in In re PCH Assoc., 804 F.2d 193 (2d Cir.1986) (hereinafter PCH I ), did not conclusively establish the nature of the relationship between PCH and Liona. We conclude that Liona is a secured creditor that holds an equitable mortgage with respect to the land underlying the hotel and is not a joint venturer. Liona, therefore, is entitled to priority in the distribution of the proceeds from the sale of the subject property.
 
 BACKGROUND
 
 2
 This dispute has a rather complex factual and procedural history. In setting forth the background, we assume familiarity with our prior decision in PCH I and with the prior decisions of the bankruptcy and district courts. Accordingly, we focus primarily on the general nature of the relationship between PCH and Liona.[1] While at various times during the course of events that transpired between the parties to this action other entities were involved in the negotiations, the ultimate participants in the transaction at issue were PCH and Liona.
 
 
 3
 PCH, formerly known as Simon Associates (Simon), is a Pennsylvania limited partnership. In September 1981, prior to the events that underlie this appeal, Simon owned and operated the Philadelphia Centre Hotel (Hotel) located in Philadelphia, Pennsylvania. Simon also held title to the land and the improvements thereon. In 1980, Richard Bernstein (Bernstein), a real estate developer, became interested in acquiring and operating the Hotel. Bernstein determined that in addition to seller provided financing he would need $9 million to cover acquisition, renovation and startup costs. A group of domestic investors agreed to provide $4 million. These investors acquired Simon's interest in the Hotel property and became new limited partners in PCH.
 
 
 4
 Bernstein then approached the Fidinam Group (Fidinam), a Swiss based financial services organization that provides investment services for clients, to explore the possibility of securing the remaining $5 million for his venture from its clients. Negotiations ensued between the parties. Bernstein insisted that PCH retain the tax benefits associated with operating the Hotel. Fidinam wanted the deal structured to ensure that its investor group would own tangible assets and would receive a guaranteed annual rate of return. Fidinam also emphasized that its investor group did not want to become involved in managing the operations of the Hotel. After much discussion, Fidinam and Bernstein eventually came to terms.
 
 
 5
 Liona, previously a Netherlands Antilles corporation and now a Delaware corporation, was the beneficiary of these negotiations and was the entity established by the foreign investors to facilitate their participation in the transaction. Pursuant to the terms of the agreement, Liona provided PCH with the $5 million that it needed to acquire and renovate the Hotel.[2] In return, Liona was to receive title to the land underlying the Hotel, a twelve percent (12%) annual return on the funds it provided and a share of the gross revenues. Liona was to have no management responsibilities. The annual return would be determined by calculating twelve percent of Liona's "Initial Investment" (the $5 million). PCH, however, had the option of repaying Liona, thereby reducing the amount of Liona's Initial Investment. In the event the amount of that Initial Investment was reduced below $5 million, Liona's annual return would be calculated at twelve percent of that reduced amount.
 
 
 6
 On August 25, 1981, the parties signed a formal "Sale Agreement," which essentially provided for a sale-leaseback transaction. Pursuant to the terms of the Sale Agreement, PCH was to convey the land underlying the Hotel to Liona in return for the $5 million. PCH would continue to own the Hotel building itself. At the time of closing, PCH would enter into a "Ground Lease" with Liona, wherein PCH would lease back the land on which the Hotel was situated. This transaction closed on September 24, 1981. On September 25, 1981, Liona recorded the deed and a memorandum of the Ground Lease with the Recorder of Deeds in Philadelphia County. Liona acquired the property subject to three pre-existing mortgages.
 
 
 7
 The initial lease term was for a period of thirty-three years. PCH, however, had the option of renewing the lease for four renewal terms of thirty-three years each, making the maximum possible term of the lease 165 years. On expiration of the Ground Lease, Liona would regain not only possession of the land but also would obtain title to the Hotel and any improvements. The minimum "fixed" rent for the first twenty-four months of the lease term was $600,000 per year. Beginning in month twenty-five and ending in month thirty-six, Liona was to receive, in addition to the fixed rent, a percentage rent determined by a formula based on the Hotel's occupancy rate for the previous year. During months thirty-seven through the balance of the lease, PCH would pay only a percentage rent based on its gross revenues. Specifically, Liona was to receive twenty percent (20%) of the Hotel's increase in gross room revenue, ten percent (10%) of all increases in gross food and beverage revenues and fifteen percent (15%) of any increase in the gross revenue generated through the rental of the Hotel's commercial space.
 
 
 8
 In the event that PCH failed to make the payments required under the Ground Lease or to perform other specific obligations thereunder, Liona had the right to retake the land and the Hotel as well as any improvements thereto. Liona also had the right to examine the books and records relating to the Hotel operation, the right to approve of substantial changes to the Hotel building and the right to step in to assume control if PCH did not carry out its obligations. However, Article 3, Section 3.10 of the Ground Lease specifically provided in pertinent part: "Landlord (Liona) shall in no event be construed or held to be a partner or associate of Tenant (PCH) in the conduct of its business, nor shall Landlord be liable for any debts incurred by Tenant in the conduct of said business."
 
 
 9
 On November 2, 1984, PCH filed for bankruptcy under Chapter 11 of the Bankruptcy Code (Code). PCH continued to operate the Hotel as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107-1108. However, PCH did not make the payments due under the Ground Lease to Liona as specified. Because PCH was in bankruptcy, the automatic stay provision, section 362(a) of the Code, precluded Liona from pursuing any of its nonbankruptcy remedies to the default. Accordingly, by motion dated December 28, 1984, Liona moved in the bankruptcy court pursuant to section 365 of the Code for an order directing PCH to perform its obligations under the Ground Lease and for adequate protection under Code section 363(e). Section 365 provides a landlord with a procedure for compelling a tenant to choose either to make the payments due under the lease or to reject the lease and to surrender the property to the landlord. See 11 U.S.C. § 365(d)(3)-(4). In response, on January 15, 1985, PCH initiated an adversary proceeding against Liona contending that the agreement was not a "true lease" but rather a "subordinated financing" or a "joint venture" agreement.
 
 
 10
 The bankruptcy court, Lifland, J., conducted a hearing on this issue and concluded that the arrangement was a joint venture and that section 365 was inapplicable. In re PCH Assoc., 55 B.R. 273, 283-84 (Bkrtcy. S.D.N.Y.1985). That determination was subsequently affirmed in its entirety by the district court, Tenney, J. In re PCH Assoc., 60 B.R. 870 (Bkrtcy.S.D.N.Y.1986) (hereinafter the proceedings conducted by Bankruptcy Judge Lifland and Judge Tenney and the decisions therein will be referred to as "the section 365 proceedings"). On appeal, we affirmed the determination that section 365 was inapplicable given the nature of the transaction involved. PCH I, 804 F.2d 193. Our opinion, however, specifically stated: "It is unnecessary ... to identify the transaction as a joint venture, security agreement, subordinated financing or other investment scheme. Suffice it to say that it is not a bona fide lease." Id. at 199. Indeed, we declared: "We do not reach the issue of whether the Ground Lease and Sale-Leaseback Agreement create a joint venture." Id. at 201.
 
 
 11
 Soon after our decision in PCH I, PCH stopped operating the Hotel. In response, the bankruptcy court granted the third mortgagee relief from the automatic stay imposed by Code section 362 and a foreclosure sale of both the land and the Hotel was scheduled for December 1986. On the date scheduled for the foreclosure sale, a Chapter 11 petition was filed against Liona in the United States Bankruptcy Court for the Eastern District of Pennsylvania (Pennsylvania court). The filing of this Chapter 11 petition resulted in a stay of the foreclosure sale.
 
 
 12
 On February 11, 1987, pursuant to an agreement between Liona and PCH and with the approval of the Pennsylvania court, the Hotel was put up for sale at public auction. PCH and Liona reserved their respective rights to the proceeds of the sale. By order dated February 12, 1987, Bankruptcy Judge Blackshear approved the sale to an individual who bid approximately $20 million. That order expressly provided: "[A]ll rights of PCH and Liona as against each other and as against third parties shall be preserved and determined at a later time." On May 8, 1987, Bankruptcy Judge Blackshear entered an order confirming PCH's Second Amended Plan of Reorganization. In accordance with that plan, the proceeds of the Hotel sale were used to satisfy in full all priority and secured claims, with the exception of certain claims that remain in dispute. The remaining funds totaling approximately $4.6 million are currently being held in escrow pending resolution of this dispute and disposition of the claims of other creditors.
 
 
 13
 On August 19, 1987, Liona initiated this adversary proceeding in the United States Bankruptcy Court for the Southern District of New York, Blackshear, J., seeking a determination that its interest in the sale proceeds was a "secured" claim and that it had a valid lien or security interest, or alternatively that it had a prior equitable interest in the proceeds of the sale. PCH counterclaimed seeking permission to disburse the sale proceeds being held in escrow to its unsecured creditors. The parties cross-moved for summary judgment.
 
 
 14
 By opinion dated May 5, 1988, Bankruptcy Judge Blackshear granted PCH's motion and dismissed Liona's complaint. Relying on the findings and the conclusions Bankruptcy Judge Lifland had made during the section 365 proceedings, Bankruptcy Judge Blackshear concluded that the "law of the case" doctrine precluded Liona from re-litigating the nature of its relationship with PCH. The bankruptcy court also ruled in favor of PCH on its counterclaim, holding that Liona should not share in the proceeds of the sale until all of PCH's administrative and unsecured creditors were paid. Thus, the bankruptcy court held that PCH's unsecured creditors were entitled to priority over Liona and its creditors. Liona appealed this decision to the district court. Judge McKenna, in an unpublished decision dated December 3, 1990, affirmed the decision of the bankruptcy court in all respects. Liona filed a timely notice of appeal and the case is now properly before us. The parties agree that Pennsylvania law controls the non-federal issues in the case.
 
 DISCUSSION
 
 15
 The central question we must address is whether the prior determination that the relationship between Liona and PCH was that of a "joint venture"--which was made during the course of the section 365 proceedings--precluded Liona from asserting an interest in the proceeds from the sale of the Hotel property. Because both Judge McKenna and Bankruptcy Judge Blackshear relied on the "law of the case" doctrine in deciding the instant case, we find ourselves once again being called on to review the findings and conclusions reached by Bankruptcy Judge Lifland and affirmed by Judge Tenney during the course of the section 365 proceedings. Liona argues that, as reflected in the documentation that memorialized its agreement with PCH, its relationship with PCH is most appropriately characterized as that of a secured creditor. PCH contends that Liona is barred from litigating this issue by the doctrines of res judicata and collateral estoppel as well as by the "law of the case" doctrine.
 
 A. Law of the Case
 
 16
 Under the law of the case doctrine, a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation. 1B J. Moore, J. Lucas & T. Currier, Moore's Federal Practice p 0.404, at 117 (1991) (hereinafter "Moore's Federal Practice "). "[T]he doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 815-16, 108 S.Ct. 2166, 2177, 100 L.Ed.2d 811 (1988) (quoting Arizona v. California, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983) (dictum)). This doctrine is a discretionary rule of practice and generally does not limit a court's power to reconsider an issue. 1B Moore's Federal Practice p 0.404, at 120 ("[L]aw of the case is ... a rule of practice and not a limit on authority."). While the doctrine is ordinarily applied in later stages of the same lawsuit, it also has application to different lawsuits between the same parties. See Schupak v. Califano, 454 F.Supp. 105, 114 n. 17 (E.D.N.Y.1978) (recognizing that courts usually apply law of the case doctrine to bar relitigation of issues decided in earlier proceedings of the same lawsuit, employing it in later stages of the same lawsuit). The doctrine has been summarized as follows:
 
 
 17
 Law of the case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit. These rules do not involve preclusion by final judgment; instead, they regulate judicial affairs before final judgment.
 
 
 18
 18 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 4478, at 788 (1981) (hereinafter "Federal Practice & Procedure ").
 
 
 19
 Here, the original determination that the relationship between Liona and PCH was a joint venture was made by Bankruptcy Judge Lifland and was affirmed by Judge Tenney. In affirming the determination that the PCH/Liona agreement was not a "true lease," however, we specifically stated in PCH I that we were not deciding the joint venture issue. 804 F.2d at 199. Thus, we have never resolved the question of how to characterize the relationship between PCH and Liona. Given our silence in PCH I, the decision in the section 365 proceedings technically remained the law of the case:
 
 
 20
 In the case in which the mandate of the appellate court does not address a particular issue, the appellate judgment, on this issue, does not establish the law of the case, and on appeal from the judgment rendered after remand, it may be reviewed by the appellate court. It remains, however, that the issue was decided by the district court in an earlier case and was not disapproved by the appellate court. It is, therefore, the law of the case.
 
 
 21
 1B Moore's Federal Practice p 0.404[4.--3], at 131 (emphasis added). Thus, it was well within the discretion of the bankruptcy court and the district court to have concluded that the prior determination, that the relationship between PCH and Liona was that of a joint venture, constituted the law of the case and should not have been disturbed.
 
 
 22
 Application of the doctrine at the bankruptcy court and district court levels, however, does not preclude us from conclusively determining the issue we left unanswered in PCH I--whether the relationship between Liona and PCH properly was characterized as a joint venture. "[A] district court's adherence to law of the case cannot insulate an issue from appellate review." Christianson, 486 U.S. at 817, 108 S.Ct. at 2178; see also 8 Federal Practice & Procedure § 4478, at 801 ("So long as a matter is properly preserved in the lower court, the fact that the lower court can properly refuse reconsideration as a matter of law of the case of course does not prevent subsequent review and reversal on appeal.").
 
 B. Res Judicata/Issue Preclusion
 
 23
 As an alternative argument in support of barring Liona from litigating the nature of the relationship created by the sale-leaseback arrangement, PCH asserts that the lower courts should have applied the doctrines of res judicata and issue preclusion (collateral estoppel). We disagree.
 
 
 24
 The bankruptcy court and the district court below correctly chose not to apply these doctrines to the instant case. Both res judicata and issue preclusion contemplate the existence of a final judgment by the highest court to have considered the case. With respect to issue preclusion, it must be remembered that for the doctrine to be properly invoked the particular issue currently in dispute must have been "both actually litigated and actually decided." 18 Federal Practice & Procedure § 4419, at 177; § 4420, at 182; see also Tucker v. Arthur Andersen & Co., 646 F.2d 721, 728 (2d Cir.1981) (a determination is conclusive in a subsequent action between the parties "[w]hen an issue of fact is actually litigated and determined by a valid and final judgment"). Moreover, "to operate as an estoppel ... the determination of the issue must have been essential to the judgment." Tucker, 646 F.2d at 728. In sum, the bar of issue preclusion applies only if: (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits. 18 Federal Practice & Procedure § 4416, at 137-38; see also Gelb v. Royal Globe Ins. Co., 798 F.2d 38, 44 (2d Cir.1986) (citing 18 Federal Practice & Procedure § 4416), cert. denied, 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987).
 
 
 25
 As noted above, PCH I did not conclusively determine the nature of the relationship between Liona and PCH. Indeed, we went to great lengths to make clear that we were not deciding that issue. To hold that our intentional decision not to resolve this issue amounts to a final adjudication on the issue would be to misapply the settled law regarding issue preclusion. See Gelb, 798 F.2d at 45 ("[I]f an appeal is taken and the appellate court affirms on one ground and disregards the other, there is no collateral estoppel as to the unreviewed ground.") (citations omitted).
 
 
 26
 We now turn to PCH's res judicata argument. Res judicata, or claim preclusion, precludes a litigant from advancing in a new action all claims or defenses that were or could have been raised in a prior proceeding in which the same parties or their privies were involved and that resulted in a judgment on the merits. See Brown v. Felsen, 442 U.S. 127, 131, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767 (1979); Tucker, 646 F.2d at 727; 18 Federal Practice & Procedure § 4406, at 43-48. In applying the doctrine, we must be careful to examine the specific facts and circumstances of the prior adjudication. Here, in the section 365 proceedings, PCH initiated an adversary proceeding in the bankruptcy court seeking to establish that its agreement with Liona was not a "true lease." This was a direct response to Liona's section 365 motion that sought to force PCH either to accept or to reject its obligations under the Ground Lease.
 
 
 27
 In support of its res judicata argument, PCH relies on the compulsory counterclaim rule of Fed.R.Civ.P. 13(a), which Bankruptcy Rule 7013 makes applicable in bankruptcy proceedings. Fed.R.Civ.P. 13 provides in pertinent part:
 
 
 28
 (a) Compulsory Counterclaims. A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim.
 
 
 29
 The purpose of Fed.R.Civ.P. 13(a) is to permit a court to decide all related claims in one action, thereby avoiding "a wasteful multiplicity of litigation." 6 C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 1409, at 46 (1990). Bankruptcy Rule 7013 provides that Fed.R.Civ.P. 13 applies in adversary proceedings "except that a party sued by a trustee or debtor in possession need not state as a counterclaim any claim that the party has against the debtor, the debtor's property, or the estate, unless the claim arose after the entry of an order for relief." 11 U.S.C. Rule 7013 (emphasis added). Thus, Rule 7013 carves out an exception to the compulsory counterclaim rule for claims against the estate that arose prior to "an order for relief." In such instances, even if the trustee or debtor-in-possession initiates an adversary proceeding against a third party, "the third party's claim need not be raised as a counterclaim in the answer to the trustee's [or debtor's] complaint even if the claim arises out of the same transaction or occurrence." 9 Collier on Bankruptcy p 7013.04, at 7013-5 (15th ed. 1990).
 
 
 30
 PCH argues that its initiation of the section 365 adversary proceeding called into question all aspects of the PCH/Liona relationship and that if Liona believed itself to be a secured creditor Liona was required to raise that issue as a counterclaim or risk losing it. Additionally, PCH contends that the exception provided by Rule 7013 is inapplicable because Liona's claim arose after the commencement of the Chapter 11 proceeding. We find PCH's arguments to be specious and to turn on nothing more than distortions of the record.
 
 
 31
 First, any claim that Liona possessed against the PCH estate arose prior to the initiation of the PCH bankruptcy proceedings and accordingly the compulsory counterclaim rule was inoperative. The Sale Agreement and the Ground Lease were both executed well before the Chapter 11 petition was filed; therefore, any claims stemming from those agreements did not arise after the bankruptcy commenced. The mere fact that PCH challenged the nature of Liona's interest does not negate the fact that Liona's claim, if any, arose prior to the filing of the petition. Compare In re Smith, 52 B.R. 792, 795-96 (Bkrtcy. E.D. Cal.1985) (creditor's claim stemmed from actions allegedly taken by the trustee after the commencement of the bankruptcy proceeding). Moreover, as we explain in detail below, we deem the actions taken by Liona, the courts, PCH and the other creditors to have satisfied any notice of claim requirements imposed by the Code.
 
 
 32
 Second, Liona's primary concern in the adversary proceeding was to establish that the Ground Lease was, in fact, a lease for purposes of section 365. Indeed, it was Liona's filing of a motion seeking an order from the court directing PCH either to accept or to reject the Ground Lease that precipitated PCH's initiation of the adversary proceeding. PCH would have us adopt a rule that requires a party to an adversary proceeding to anticipate every possible recharacterization of a transaction that a court may consider and to assert those possibilities in the form of a counterclaim. We do not believe that Rule 7013 requires this. Indeed, we think that such a reading of Rule 7013 and Fed.R.Civ.P. 13(a) undermines the very efficiency concerns that motivated the adoption of these provisions. Furthermore, our review of the record indicates that the filing of such a counterclaim in this case would have been needlessly repetitious. Liona was claiming to have had rights superior to those of a mortgagee--fee simple ownership.
 
 
 33
 Moreover, PCH itself suggested on numerous occasions before the bankruptcy court that Liona's interest was properly characterized as "subordinated financing" or a "secured transaction." In its adversary complaint, PCH stated: "The Debtor also believes all parties would be served best by a declaration that the Liona Agreement is a subordinated financing." When read in context and in light of PCH's other statements, it is clear that when using the term "subordinated financing" PCH was merely indicating that Liona's interest was subject to the claims of three superior mortgagees. In its application dated April 23, 1985 seeking additional time either to accept or to reject the Ground Lease, PCH expressly stated that the agreements between Liona and itself "clearly indicate that the parties were, in fact, acting as partners or engaged in a secured financing arrangement." (emphasis added). In its trial brief to the court dated May 6, 1985, PCH stated that deposition testimony indicated that the minimum rent provision in the Ground Lease "was tantamount to a conventional mortgage security interest to protect the investment of Liona's clients." (emphasis added). In that same filing, it was stated "at the very minimum, Liona merely holds the equivalent of a mortgage." (emphasis added). Thus, the question whether Liona was a secured creditor was before the court, PCH having expressly placed it there.
 
 
 34
 Finally, in deciding PCH I, we never decided how the PCH/Liona relationship should be characterized: "Whether these contracts create a joint venture, a security agreement, or some other form of investment need not be decided here." PCH I, 804 F.2d at 201. Plainly, we were operating under the assumption that the proper manner of characterizing the PCH/Liona transaction would have to await another day. That day has now arrived. In short, we believe that the issue of how to characterize the PCH/Liona relationship is properly before us. That being said, our task is to resolve this rather complex question.
 
 C. The Section 365 Proceedings
 
 35
 Bankruptcy Judge Lifland conducted an evidentiary hearing to explore the nature of the legal relationship between PCH and Liona. Procedurally, the issue was before the bankruptcy court as a result of the adversary proceeding that PCH had initiated to resolve the section 365 dispute involving the Ground Lease. As we have noted, Bankruptcy Judge Lifland held that the Ground Lease was not a true sale and leaseback and that the relationship between PCH and Liona was in reality a "joint venture."
 
 1. Bankruptcy Judge Lifland's Findings
 
 36
 In evaluating the PCH/Liona relationship, Bankruptcy Judge Lifland looked to the terms of the relevant agreements entered into by PCH and Liona. Finding the language of the Sale Agreement and the Ground Lease to be ambiguous, the bankruptcy court accepted extrinsic evidence to provide some insight into the true intentions of the parties. See In re PCH Assoc., 55 B.R. at 279. In PCH I, we concluded that under Pennsylvania law such extrinsic evidence was properly admitted. PCH I, 804 F.2d at 197-98.
 
 
 37
 After reviewing the documentary and testimonial evidence, Bankruptcy Judge Lifland made several findings of fact. See In re PCH Assoc., 55 B.R. at 276-78. With respect to the Sale Agreement, the court found, inter alia:
 
 
 38
 (1) Liona's investment of $5 million constituted five-ninths of the total price of the Hotel renovation. PCH contributed the remaining $4 million.
 
 
 39
 (2) In evaluating the value assigned to the land for purposes of the sale-leaseback transaction, Liona used a predetermined rate of return on investment instead of the value of the property--in a normal land sale, a buyer analyzes the purchase price based on market conditions.
 
 
 40
 (3) Any savings in the cost of renovating the Hotel would be shared by PCH and Liona proportionately, four-ninths and five-ninths respectively.
 
 
 41
 (4) The agreement mandated that Bernstein be the lessee or a corporation controlled by him be the general partner of a partnership that is the lessee under the Ground Lease.
 
 
 42
 (5) Section 7 required Liona to provide one-half of the amount necessary to repay a pre-existing mortgage on the land and Hotel building.
 
 
 43
 (6) Section 5 provided that PCH was required to absorb any increase in closing costs, to pay the transfer taxes, and to pay the title insurance premium. Such provisions were contrary to custom in the Philadelphia real estate market.
 
 
 44
 (7) Any savings to PCH in the completion of the project were either to be divided proportionately, five-ninths to Liona and four-ninths to PCH, or used to refurbish the Hotel, if necessary.
 
 
 45
 Id. at 276-77. Pursuant to the terms of the Sale Agreement on the date of closing the parties also entered into a Ground Lease for the property underlying the Hotel. With regard to that Ground Lease, the bankruptcy court found several elements that it deemed to be unusual in a "true lease," including:
 
 
 46
 (1) The lessee PCH solicited the lessor Liona to participate in the transaction.
 
 
 47
 (2) Given the renewal provisions of the lease, the lease term could be as much as 165 years--an inordinately long period.
 
 
 48
 (3) The lessor Liona could not capture any benefit from appreciation in the land value because the minimum rent due was fixed during the term of the lease term to be $600,000 or 12% of the landlord's Initial Investment.
 
 
 49
 (4) The rent called for bore no relationship to the true land value and Liona could not benefit from any appreciation in the land value.
 
 
 50
 (5) Liona's $5 million Initial Investment was subject to reduction pro-rata for any savings in the Hotel project and could be repaid in full at any time, thereby releasing PCH from its fixed rent obligation.
 
 
 51
 (6) Liona's return was fixed at 12% of the total amount of its Initial Investment. In the event that the $5 million Investment was reduced, the return or fixed rent would be calculated as 12% of the reduced amount.
 
 
 52
 (7) In the event of condemnation, Liona and PCH would share pro rata in the distribution of the compensation received. Once Liona recaptured its entire Initial Investment, such proceeds would be shared equally.
 
 
 53
 (8) Neither PCH nor any of its partners was personally liable for the payments due to Liona.
 
 
 54
 (9) Liona and PCH each had the option of buying out the other if either party received a bona fide offer from a third-party.
 
 
 55
 (10) Under Article 3.02 and 3.05, once Liona's Initial Investment was repaid in full, it would share equally in the net-cash flow of the Hotel.
 
 
 56
 Id. at 277-78.
 
 2. The Conclusion From These Findings
 
 57
 Based on these and several other findings, Bankruptcy Judge Lifland concluded that under Pennsylvania law the agreements between Liona and PCH gave rise to a joint venture. In re PCH Assoc., 55 B.R. at 281-84. The court's decision was premised on four primary factors: (1) both PCH and Liona contributed to the Hotel project, (2) Liona was to share in the cash flow of the Hotel, (3) Liona retained an active interest in and control over the Hotel operation, and (4) the agreement between PCH and Liona was limited to the Hotel operation. Id. at 281-82. The bankruptcy court stated: "Suffice it to say that this court is persuaded by the terms of the [Sale Agreement], the Ground Lease, the testimony adduced at trial, and the other evidence presented that the parties intended to enter into and did successfully construct a joint venture agreement." Id. at 283. In its written decision, the court focused exclusively on the "joint venture" characterization and did not explain why treating the PCH/Liona relationship as a secured financing transaction would have been inappropriate. Similarly, in his opinion affirming the decision of the bankruptcy court, Judge Tenney focused exclusively on the joint venture/lease analysis and did not discuss any other possible characterizations. 60 B.R. at 875-78.
 
 D. Standard of Review
 
 58
 While the instant matter is technically an appeal from a 1990 order of the district court, McKenna, J., we are in reality being called on to review the decisions that provided the basis for the appeal in PCH I. This is so because both the bankruptcy court and district court eventually disposed of this case by applying the "law of the case" doctrine. Thus, we must review the decisions that were deemed to have established the "law of the case."
 
 
 59
 An order of a district court issued in its capacity as an appellate court is subject to plenary review. In re Manville Forest Products Corp., 896 F.2d 1384, 1388 (2d Cir.1990). We, therefore, will independently review the factual determinations and legal conclusions of the bankruptcy court. Id. The bankruptcy court's findings of fact will not be disturbed unless clearly erroneous. Brunner v. New York State Higher Educ. Services Corp., 831 F.2d 395, 396 (2d Cir.1987) (per curiam); see also 11 U.S.C. Rule 8013 ("[f]indings of fact ... shall not be set aside unless clearly erroneous and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses"). We review the bankruptcy court's conclusions of law de novo. Brunner, 831 F.2d at 396.
 
 
 60
 In light of these standards, our primary focus is on the determinations made by Bankruptcy Judge Lifland during the section 365 proceedings. We now turn to the central issue: Whether the PCH/Liona relationship was properly characterized as a joint venture.
 
 E. Characterizing the PCH/Liona Transaction
 
 61
 There is no doubt that Bankruptcy Judge Lifland properly looked to the underlying substance of the PCH/Liona transaction and not just to its form. PCH I, 804 F.2d at 198 ("[E]ven apart from the propriety of admitting parol evidence ... to clarify ambiguity, it was not error to look behind the form of the agreements to the economic substance of the transactions."). It is well established that a bankruptcy court, as a court of equity, may look through form to substance when determining the true nature of a transaction as it relates to the rights of parties against a bankrupt's estate. Pepper v. Litton, 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939). It is the economic substance of a transaction that should determine the rights and obligations of interested parties. See Sun Oil Co. v. CIR, 562 F.2d 258, 263 (3d Cir.1977) ("[W]e look to the economic realities of the leases and not to the labels applied by the parties."), cert. denied, 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978). As is evidenced in this case, the decision by a court to recharacterize a formal transaction can have a tremendous impact on the rights and obligations of the parties to the transactions as well as to the interests of third parties. Given this fact, it is not surprising that no clear formula for determining such questions has emerged. See generally Homburger & Andre, Real Estate Transactions and the Risk of Recharacterization in Bankruptcy Proceedings, 24 Real Prop., Prob. & Trust J. 95, 103-04 (1989) (hereinafter Risk of Recharacterization ) (noting that no clear approach has emerged and suggesting that a case-by-case analysis is required).
 
 
 62
 We begin our analysis of the PCH/Liona relationship where PCH I left off. In PCH I, we held that the economic relationship between PCH and Liona was not that of tenant and landlord because the agreements between the parties did not constitute a "true lease" under section 365 of the Code. In reaching that conclusion, we looked to a related provision of the Code for guidance--section 502(b)(6). See PCH I, 804 F.2d at 199-200. Code section 502(b)(6) limits the amount of a claim for unpaid rent that a landlord can make against the estate of a tenant that is in bankruptcy. After reviewing the legislative history of that provision, we concluded that the statutory term "lease of real property" does not "apply to lease financing transactions or to leases intended as security, but rather applies only to a 'true' or 'bona fide' lease." Id. at 199. We explained: "Thus, where the purported 'lease' involves merely a sale of the real estate and the rental payments are, in truth, payments of principal and interest on a secured loan involving a sale of real estate, there is no true lease and section 502(b)(6) does not apply." Id. (citations omitted). We concluded that this analysis applied equally in the section 365 context because related provisions of the Code should be read together.
 
 
 63
 In holding that the PCH/Liona agreements did not constitute a "true lease," we sought to implement what is perhaps the predominant policy objective of a bankruptcy proceeding--equal treatment of similarly situated creditors. We recognized that section 365 confers special rights on a debtor-lessee and its lessor. Specifically, the debtor-lessee or the bankruptcy trustee has the authority either to accept or to reject executory contracts or unexpired leases.
 
 
 64
 Additionally, as happened in this case, a lessor has the right to seek from the bankruptcy court an order compelling the debtor-lessee to make that choice. See 11 U.S.C. § 365(d)(3)-(4). If the debtor-lessee chooses to reject the lease, the lease is terminated and the lessor's property is released from the bankrupt debtor's estate. Alternatively, if the debtor-lessee assumes the lease, the lessor is entitled to the payments called for under the lease and any previous defaults must be cured. See 11 U.S.C. §§ 365(b), 365(d)(3)-(4); see also 2 Collier on Bankruptcy p 365.03, at 365-32 to 33 (15th ed. 1991). Thus, the Code affords special treatment to unexpired leases thereby placing lessors in a better position than other contractual creditors--even a secured creditor. See Risk of Recharacterization at 116. As we noted:
 
 
 65
 If [secured] transactions, loans and other financing arrangements can be couched in lease terms, and can thereby be assumed by the bankrupt estate, the "lessor" gains a distinct advantage at the expense of other creditors without a concomitant benefit to the bankrupt estate. This is especially apparent in the case at bar. If successful, Liona would enjoy the benefit of its contract with PCH to the detriment of others having valid claims against the bankrupt's estate. However, if there is no true lease, Liona should not be permitted to escape the consequences of investor/creditor status by invoking labels of "landlord" and "lease."
 
 
 66
 804 F.2d at 200.
 
 
 67
 Under Pennsylvania law, "[w]hat constitutes a joint venture is a question of law; but whether a joint venture exists is generally a question of fact." Wilkins v. Heebner, 331 Pa.Super. 491, 496, 480 A.2d 1141, 1144 (1984) (citing Keeler v. Int'l Harvester Used Truck Ctr., 317 Pa.Super. 244, 246, 463 A.2d 1176, 1178 (1983)). "A joint venture is not a status created or imposed by law; it is a relationship voluntarily assumed and arising wholly from contract." Snellbaker v. Herrmann, 315 Pa.Super. 520, 526, 462 A.2d 713, 716 (1983). The relationship may arise from an express contract or may be implied from the acts and conduct of the parties. McRoberts v. Phelps, 391 Pa. 591, 598-99, 138 A.2d 439, 443 (1958) (footnote omitted).
 
 
 68
 In Pennsylvania, it is well established that to constitute a joint venture the existence of four factors is essential:
 
 
 69
 (1) each party to the venture must make a contribution, not necessarily of capital, but by way of services, skill, knowledge, materials or money; (2) profits must be shared among the parties; (3) there must be a "joint proprietary interest and right of mutual control over the subject matter" of the enterprise; (4) usually, there is a single business transaction rather than a general and continuous transaction.
 
 
 70
 McRoberts, 391 Pa. at 599, 138 A.2d at 443-44 (footnotes omitted). "The existence or non-existence of a joint venture depends on the facts and circumstances of each particular case and no fixed nor fast rule can be promulgated to apply generally to all situations." McRoberts, 391 Pa. at 600, 138 A.2d at 444. Moreover, the presence of any one of these elements in isolation ordinarily is not enough to support a joint venture finding. See Marcus v. Grant, 289 Pa. 1, 4, 137 A. 120, 121 (1927) (sharing of profits alone not enough to create a joint venture).
 
 
 71
 A joint venture is in many ways similar to a partnership agreement. The primary difference between them is that a joint venture is usually arranged for a single transaction whereas a partnership is formed to conduct a continuing business. See West v. Peoples First National Bank & Trust Co., 378 Pa. 275, 281-82, 106 A.2d 427, 431 (1954); see also Bell v. Johnston, 281 Pa. 57, 59, 126 A. 187, 188 (1924) ("in so far as equity is concerned, the rights of the parties [to a joint venture] are controlled by the same principles as are those of partners") (citations omitted); Uniform Partnership Act, 15 Pa.Cons.Stat.Ann. § 8312, at 878-79 (Purdon 1991) (defining the elements of a partnership). The rights and obligations that exist between the parties to a joint venture agreement depend primarily on the terms of the agreement that created the relationship. These obligations and responsibilities need not be equal and they may differ in character as well as amount. While Pennsylvania has not clearly stated whether the parties to a joint venture must share losses, it has been suggested, and we believe, that an agreement to share losses would be an additional indication of an intent to create a joint venture. See Waldman v. Shoemaker, 367 Pa. 587, 591, 80 A.2d 776, 778 (1951) ("nor was there any agreement, express or implied, to share the losses "); see also Uniform Partnership Act, 15 Pa.Cons.Stat.Ann. § 8327, at 824 (Purdon 1991) (partners are jointly and severally liable for all debts and obligations of the partnership); 20 Pennsylvania Law Cyclopedia, Joint Ventures § 2, at 137 (1990) ("a right to share in profits, and a duty to share in any losses" are elements of a joint venture).
 
 
 72
 Given the fact intensive nature of the joint venture analysis, we must afford substantial deference to Bankruptcy Judge Lifland's findings. Indeed, after reviewing the record and the operative documents, we see no basis for setting aside the majority of his findings. The question remains whether the legal elements of a joint venture under Pennsylvania law have been satisfied. We believe that on balance they have not been.
 
 
 73
 There is no question that Liona and PCH each contributed to the Hotel project in the sense that both parties' funds made the project possible and that their relationship was exclusively limited to the Hotel project. Thus, two of the essential elements of Pennsylvania's joint venture test have been met. We cannot conclude, however, that the findings of the bankruptcy court support its determinations that PCH and Liona were to share profits and that Liona exercised control over the Hotel enterprise. While we acknowledge that the structure of this transaction defies easy categorization, we believe that the relationship between PCH and Liona is more properly viewed as being one of debtor and secured creditor.
 
 
 74
 In our view, the agreements between PCH and Liona were nothing more than a sophisticated secured financing arrangement. PCH was to get the money it needed to refurbish the Hotel and Liona was to receive a fixed rate of return on the funds it advanced. The principal amount advanced by Liona ($5 million) was subject to reduction or complete payoff, thereby affording PCH the option of removing its obligation to make what essentially were interest payments. Liona, to protect its funds, retained title to the land and in the event of a default had the right to retake not only possession of that land but also the Hotel and improvements. While title to the underlying land was actually transferred by a deed absolute, that conveyance merely served as security for the funds that Liona had advanced. Essentially, Liona was holding an equitable mortgage. Moreover, Liona's limited participation in the gross revenues of the Hotel was not inconsistent with a debtor-creditor relationship. As one scholar aptly has summarized:
 
 
 75
 The mortgage financing and sale-leaseback structures are similar in several respects. In both transactions, the "borrower" retains possession of the property and is responsible for the maintenance and carrying costs thereof. A mortgage financing transaction necessarily entails the loaning of money to the mortgagor, and a sale-leaseback may be viewed as a loan of the fee owner's property to the lessee. The consideration paid in a mortgage financing transaction is denominated "interest," and the consideration in a leasing transaction is called "rent." At the expiration of the term of the mortgage financing transaction, the mortgagee receives the balance of the funds loaned to the mortgagor; at the expiration of the lease term, the lessor receives possession of the real property which had been leased. A lessor under a true lease ... and a mortgagee ... are both accorded recourse to the subject property (among other remedies) for satisfaction of the obligations owing to them.
 
 
 76
 L. Cherkis, Collier Real Estate Transactions and the Bankruptcy Code p 2.02, at 2-35 (1990).
 
 
 77
 We conclude that the deed to the land underlying the Hotel while on its face conveying absolute ownership to Liona was in reality nothing more than security for the funds that Liona made available to PCH. In short, Liona held an equitable mortgage. PCH, in marked contrast to its position with respect to the terms of the Sale Agreement and Ground Lease, contends that it is improper for a court to look behind documents that on their face accomplish an absolute conveyance of real property. We do not dispute that under Pennsylvania law the general rule is that a deed absolute on its face should not be treated as a mortgage. See 21 Pa.Stat.Ann. § 951 (Purdon 1991) (hereinafter "Defeasance Statute"). Pennsylvania's Defeasance Statute provides in pertinent part: "No defeasance to any deed for real estate, regular and absolute upon its face ... shall have the effect of reducing it to a mortgage, unless the said defeasance is in writing, signed and delivered by the grantee in the deed to the grantor; and [recorded properly in the public records]." Id. The Pennsylvania Supreme Court, however, has held that the Defeasance Statute's primary objective is to protect those who hold record title and that the statute's bar is inoperative when it is the title holder who seeks to demonstrate that the conveyance was not intended to be absolute. Williams v. Moodhard, 341 Pa. 273, 280-81, 19 A.2d 101, 104-05 (1941). Adopting this reasoning, the Third Circuit has held that the Pennsylvania Defeasance Statute does not preclude a federal tax court in the exercise of its equitable powers from looking beyond the form of a transaction to its economic substance. CIR v. Penn Athletic Club Bldg., 176 F.2d 939, 943-44 (3d Cir.1949).
 
 
 78
 We believe that this analysis is equally applicable here. Liona, the record title holder to the land underlying the Hotel, now urges, as PCH repeatedly did in the section 365 proceedings, that the conveyance of the land was nothing more than security for the funds provided. The bar erected by the Pennsylvania Defeasance Statute, therefore, is inapplicable and we conclude that Liona's interest is properly treated as an equitable mortgage.
 
 
 79
 This conclusion is further supported by Liona's properly recording the deed to the land as well as notice of the lease. While only a memorandum of lease was recorded, Pennsylvania law expressly deems such a filing to be sufficient to place all parties on notice, actual or constructive, of the existence of the lease and its essential terms. See 21 Pa.Stat.Ann. §§ 404, 405, 407, 409 (Purdon 1991). Most important, as we explain later, no one was deceived by these transactions. See In re Independence Village, Inc., 52 B.R. 715, 720 (Bkrtcy.E.D.Mich.1985) (finding the existence of an equitable mortgage and concluding that "[s]ince the Lease Purchase Contract was recorded ... there is no question as to perfection of the [creditor's] interest in the real property"). As has been explained:
 
 
 80
 If the formalities of state law dealing with passage of title are complied with in a sale and leaseback transaction, however, the risk to a buyer-lessor of both losing title to the property and becoming an unsecured creditor seems quite remote. Recordation of an absolute deed should be sufficient perfection of the lessor's rights in the property as a mortgagee, even if the deed is deemed by the bankruptcy court to be for purposes of security and not an absolute transfer.
 
 
 81
 Risk of Recharacterization at 117.
 
 
 82
 Several additional factors lead us to conclude that the PCH/Liona relationship was not a joint venture, but instead a secured financing arrangement resulting in an equitable mortgage.
 
 
 83
 First, we do not believe that Liona's right to participate in increases in the Hotel's gross revenues satisfies the profit sharing element of the Pennsylvania joint venture test. The bankruptcy court itself struggled with the distinction between gross revenues and net profits. Nonetheless, the court eventually concluded that "[w]hether the parties intended to share gross or net profits is immaterial to support a finding that they entered into a joint venture. They agreed that Liona would share in the cash flow of the Hotel and then further agreed to the expenses for which PCH would have responsibility." In re PCH Assoc., 55 B.R. at 282 (citations omitted). We disagree with that conclusion. Section 3.05 of the Ground Lease makes it clear that only in the event that Liona received its full $5 million back from PCH would Liona have the right to share in up to fifty percent (50%) of the Hotel's net cash flow. Otherwise, Liona was only to receive a percentage of any increases in the Hotel's gross receipts. The payback condition, however, was never satisfied.
 
 
 84
 Sharing in gross revenues does not transform what is essentially a financing transaction into a joint venture. Many commercial leases provide for a participation in the gross revenues of a business. Similar participation by a lender, while perhaps not as common, is neither novel nor improper. See generally Steuben, The Convertible, Participating Mortgage: Federal Income Tax Considerations, 54 U.Colo.L.Rev. 237 (1983) (hereinafter "Convertible Mortgage "); Siegman & Linquanti, The Convertible, Participating Mortgage: Planning Opportunities and Legal Pitfalls in Structuring the Transaction, 54 U.Colo.L.Rev. 295, 295 (1983) (hereinafter "Planning Opportunities ") ("the convertible participating mortgage has become a permanent fixture in commercial real estate development financing"). This provision serves only as an additional incentive for the lender to advance the funds. We are convinced that under Pennsylvania law an individual or entity must share in the net profits (total revenue minus expenses) of an enterprise in order to be treated as a joint venturer. See Convertible Mortgage at 243-44 ("[P]articipation in gross or net rentals, gross income, or even cash flow will not present as great a risk [of recharacterization] as a participation in net income.") (emphasis added). Pennsylvania's Uniform Partnership Act expressly provides that the "sharing of gross returns does not of itself establish a partnership whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived." 15 Pa.Cons.Stat.Ann. § 8312(3) (Purdon 1991). Even where net profits are being shared, Pennsylvania has carved out an exception to the general presumption of partnership status if the profits were received in payment as (1) "a debt by installments or otherwise," (2) "wages as an employee or rent to a landlord," (3) "an annuity to a surviving spouse or representative of a deceased partner," (4) "interest on a loan though the amount of the payment varies with the profits of the business," or (5) "the consideration for the sale of the goodwill or of a business or other property by installments or otherwise." Id. § 8312(4).
 
 
 85
 Second, the alleged "control rights" that Liona imposed on PCH were unremarkable security preserving measures. In reaching the contrary conclusion, Bankruptcy Judge Lifland focused on the following "control rights:" (1) PCH was required to adopt certain accounting procedures and Liona was to have periodic access to PCH's books and records, (2) the parties were to cooperate in the disposition of any insurance proceeds, (3) in the event that restoration or capital improvement costs were to exceed $500,000, Liona retained the right to exercise reasonable veto power over the selection of an architect, engineer, or general contractor, (4) PCH had to obtain Liona's consent before it could dispose of its interest in the Hotel and Liona had a right of first refusal, and (5) Liona had the right to step in and to perform any acts that PCH was obligated but failed to perform, including any mortgagee's obligations. See In re PCH Assoc., 55 B.R. at 283.
 
 
 86
 None of these factors, viewed independently or collectively, is inconsistent with a secured financing transaction. Liona, as the creditor, sought to limit its risk of loss. As the transaction was structured, Liona held title to the already encumbered land underlying the Hotel and sought to bolster its position by retaining the right to take title to the Hotel in the event of a default. This inchoate interest in the Hotel building was, of course, subordinate to the interests of pre-existing mortgage holders and, given its unrecorded nature, the claims of other PCH creditors. All the conditions that the bankruptcy court focused on merely afforded Liona the right to take steps to protect the value of its security interest--the value of the land was inextricably linked to the success and value of the Hotel. Indeed, it is not uncommon for secured creditors to reserve the right to step in to perform obligations that are ordinarily the debtor's responsibility--payment of insurance premiums, payment of taxes, payment of construction workers to ensure that the property is not encumbered by mechanics' liens or approval of any major changes in the physical characteristics of the secured property. See Convertible Mortgage at 242 & n. 24 ("covenants that provide the holder of the mortgage with the typical protection required by a lender whose loan is secured by improved real estate will not lead to a determination that the holder is a partner of the mortgagor"). Such "control rights" are aimed at ensuring that the value of a security interest is not diminished. Finally, the right to inspect the books and records was nothing more than a provision aimed at protecting Liona's right to participate in the gross revenues of the Hotel.
 
 
 87
 Third, and perhaps most important, none of these alleged "control rights" demonstrate that Liona retained the right to control the operations or management of the Hotel. As the bankruptcy court itself noted, "PCH concedes that neither party ever intended Liona to have responsibility for daily Hotel management." In re PCH Assoc., 55 B.R. at 282. Lack of even minimal control over the day-to-day operations of the Hotel is inconsistent with joint venture status. See Waldman, 367 Pa. at 591-92, 80 A.2d at 778. The "control rights" outlined above suggest only that Liona, and in particular the investor interests that it represented, negotiated a favorable transaction that would insulate them from the risk of loss. It is undisputed that Liona did not possess the authority to make policy decisions or to play a role in the operational management of the Hotel.
 
 
 88
 Finally, while not itself dispositive, it is clear both from the findings of the district court and from our review of the record that Liona was to bear no responsibility for the losses of the Hotel operation. This fact further demonstrates the impropriety of characterizing the PCH/Liona relationship as a joint venture. Such a characterization, as is evidenced in this case, has the effect of subverting the economic substance of the agreement for which the parties bargained and negotiated. As we recognized in PCH I, the parties to a transaction can bind themselves inter se but the manner in which they structure their relationship is not necessarily binding on third parties. 804 F.2d at 198 ("label neither governs rights of third parties nor affects the legal consequences of the parties' agreement"); see also Bell, 281 Pa. at 60, 126 A. at 188 (" 'As to third persons, [individuals] may subject themselves to liability as partners by a course of dealing or by their acts and declarations.' ") (citations omitted); Uniform Partnership Act, 15 Pa.Cons.Stat.Ann. § 8328 (Purdon 1991) (discussing partnership by estoppel). We, however, can find nothing in this record indicating that any third parties that dealt with the Hotel or PCH believed Liona to be a participant in the business or looked to Liona's creditworthiness as a basis for doing business with the Hotel or PCH. See Planning Opportunities at 298 ("In many cases dealing with the creditor as partner issue, the determinative evidentiary facts will be the post-document conduct of the parties, not only between themselves but, more importantly, with respect to third parties.") (emphasis added) (footnote omitted).
 
 
 89
 Here, the public record clearly indicated that Liona owned the land underlying the Hotel and that PCH was the lessee of that parcel. All parties who dealt with PCH or the Hotel had notice of this fact. By recasting the transaction as a joint venture, the bankruptcy court foisted joint and several liability for all claims against the PCH estate onto Liona. The record plainly demonstrates that PCH and Liona never contemplated such liability and, more importantly, no third parties dealt with the Hotel believing that Liona's assets would be available to satisfy their claims. See generally Risk of Recharacterization at 134-36. Here, no proof was introduced to demonstrate that any third party extended credit with the understanding that Liona was a joint venturer or partner in the enterprise. Most importantly, there were no allegations of fraud or any proof thereof. In such circumstances, we believe that it was incorrect to recast the PCH/Liona relationship as a joint venture. Simply stated, this is not a case in which third parties have been deceived. Therefore, by treating the relationship as a secured transaction, no third party creditor is being deprived of any rights that he reasonably could have expected to possess at the time credit was extended to the Hotel or PCH.
 
 
 90
 Our decision to treat this purported sale and leaseback as an equitable mortgage is consistent with the reasoning adopted and the conclusions reached by other courts in similar cases. See, e.g., In re Opelika Manufacturing Co., 67 B.R. 169, 171-72 (Bkrtcy.N.D.Ill.1986) (purported lease agreement in reality a "disguised security agreement"); In re Independence Village, Inc., 52 B.R. 715, 720 (Brktcy.E.D.Mich.1985) (rejecting section 365 application and holding that "lease" was in actuality an "equitable mortgage" in real property and a security interest in the debtor's personalty); In re Seatrain Lines, Inc., 20 B.R. 577, 582 (Bkrtcy.S.D.N.Y.1982) (recharacterizing purported sale and leaseback as an "equitable mortgage"). Additionally, contrary to the arguments of PCH, we believe such a result to be consistent with the decision in In re Nite Lite Inns, 13 B.R. 900 (Bkrtcy.S.D.Cal.1981).
 
 
 91
 In Nite Lite, the court was faced with a factual situation quite similar to that presented here. The transaction there involved a planned sale and leaseback of a motel and the underlying land. However, actual transfer of title to the motel and land was to have occurred only after a series of contingencies had been satisfied. Nonetheless, the would-be buyer-lessor advanced funds to the would-be seller-lessee to assist in the construction of the motel. The transfer conditions were never satisfied and the would-be seller-lessee filed for bankruptcy. At issue in the case was the nature of the buyer-lessor's interest in the motel property.
 
 
 92
 The Nite Lite Court, looking to the substance of the transaction, found it to be nothing more than a "disguised financing arrangement." 13 B.R. at 909. The court stated that "beneficial ownership of the motel property never left [the seller-lessee], only mere legal title, which [the buyer-lessor] simply held as a mortgage." Id. at 910 (emphasis added). We believe that the Nite Lite Court when it made this statement was assuming what the ultimate nature of the transaction would have been had the parties consummated their agreement. We come to this conclusion because the Nite Lite Court eventually went on to hold that the buyer-lessor's interest was that of an unsecured claim. Thus, in apparent self-contradiction, the court concluded that the buyer-lessor's interest was the equivalent of a mortgage, yet its claim was unsecured.
 
 
 93
 The only conceivable explanation for this result is that the buyer-lessor, at the time of the seller-lessee's bankruptcy, never had acquired title to the motel and the land. Moreover, third parties dealing with the seller-lessee had no notice, actual or constructive, of the buyer-lessor's interest in the motel and the land, all in sharp contrast to the facts of the case at bar. Here, Liona acquired title to land and that fact was publicly recorded. As the Nite Lite Court recognized, had the buyer-lessor actually acquired title, it, in reality, simply would have been holding a "mortgage." Id. at 910. Our conclusion that Liona holds an equitable mortgage is entirely consistent with this reasoning.
 
 E. The Extent and Validity of Liona's Claim
 
 94
 On remand, the value of Liona's share as a secured creditor must be determined. See 11 U.S.C. § 506(a). Liona will have a "secured claim to the extent of [its] interest in the estate's interest in [the collateral]." Id.; see also 3 Collier on Bankruptcy p 506.04, at 506-19 (15th ed. 1991). Ordinarily, a secured creditor who has advanced funds on a full recourse basis also would have an unsecured claim to the extent that the value of its secured claim exceeded the value of the debtor's interest in the collateral. Id. However, section 502(b)(1) operates to disallow the unsecured or deficiency claim of such a creditor when the financing that provides the basis for the claim was advanced on a nonrecourse basis. 11 U.S.C. § 502(b)(1). In the instant case, Liona advanced the $5 million to PCH on a nonrecourse basis and its sole recorded security was the land underlying the Hotel. While the memorandum of lease also was recorded, we do not believe that that recordation afforded those who dealt with PCH adequate notice of their "true" status vis-a-vis Liona with respect to the Hotel building and improvements.
 
 
 95
 During a Chapter 11 reorganization, however, the strict requirements of section 502(b)(1) are rendered inapplicable in limited circumstances. Section 1111(b) provides in pertinent part:
 
 
 96
 (1)(A) A claim secured by a lien on a property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless:
 
 
 97
 ....
 
 
 98
 (ii) such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.
 
 
 99
 11 U.S.C. § 1111(b) (emphasis added); see also 5 Collier on Bankruptcy p 1111.02, at 1111-15 to 1111-22 (15th ed. 1991). Section 1111(b)(1)(A) "establishes the general rule, with exceptions, that a claim in a Chapter 11 case secured by a lien on property of the bankrupt estate is to be allowed against the debtor, as if the claimant had recourse against the debtor, whether or not by contract or under applicable state law the creditor had that recourse." In re Tampa Bay Assoc., Ltd., 864 F.2d 47, 49 (5th Cir.1989) (emphasis added). Therefore, except in limited circumstances, this section affords special protection to undersecured nonrecourse creditors.
 
 
 100
 Given the limited nature of the record before us and the fact that Liona itself was in bankruptcy at the time of the auction sale and consented to sale, the bankruptcy court on remand will have to determine whether the provisions of section 1111(b) convert Liona's nonrecourse unsecured claim to a recourse unsecured claim. See 5 Collier on Bankruptcy p 1111.02, at 1111-24 & n. 22a. We do hold that the value of Liona's secured claim should not exceed the value of the PCH estate's interest in the land underlying the Hotel at the time of the auction sale. The bankruptcy court, of course, will have to determine the specific value of that claim as well.
 
 
 101
 PCH, however, argues that Liona should be barred completely from asserting any claim because it failed to file a secured claim by the bar date of June 27, 1985, as ordered by Bankruptcy Judge Lifland. See 11 U.S.C. §§ 501, 502; 11 U.S.C. Rule 3003(c)(3). In a Chapter 11 proceeding, a creditor has no obligation to file a proof of claim as long as the debtor on its filings has scheduled that creditor's claim and the claim is not characterized as "disputed, contingent, or unliquidated." 11 U.S.C. § 1111(a). Here, PCH, the debtor, failed to schedule Liona's claim. Instead, PCH initiated an adversary proceeding against Liona on January 25, 1985 seeking to have the nature and extent of Liona's interest in the PCH estate determined. While recognizing that the Code does not provide for such a procedure, courts generally have treated the initiation of such a proceeding as a substitute for the filing of a disputed claim under section 501. See In re Lindsey, 823 F.2d 189, 191 (7th Cir.1987); 3 Collier on Bankruptcy p 506.07, at 506-73 to 506-74. Assuming the correctness of this procedure, a creditor such as Liona should have filed a proof of claim to preserve its rights. See 11 U.S.C. § 1111(a); 11 U.S.C. Rule 3003(c)(2). Indeed, we think it would be prudent practice to file a notice of claim in all similar cases to protect one's rights.
 
 
 102
 Given the extraordinary nature of this case, however, we believe that requiring strict compliance with the procedures for filing a notice of claim would be unwarranted. First, the basic policy behind section 501 and the notice of claim rules is to ensure that all those involved in the proceeding will be made aware of the claims against the debtor's estate and will have an opportunity to contest those claims. Because a bankruptcy proceeding by its very nature requires collective action, section 501's primary objective is to keep everyone informed. See generally 3 Collier on Bankruptcy pp 501.01-501.04. In this case, Liona's failure to file the notice of claim has not prejudiced the interests of any third party. By virtue of the first adversary proceeding and the instant case, all claimants were aware of the potential for a Liona claim. Second, the courts below as well as the parties have operated on the assumption that depending on the resolution of Liona's status the priority positions of other creditors could be varied. PCH's "Second Amended Plan of Reorganization" (Reorganization Plan) expressly reflects this. That plan designated five classes of creditors--the "Liona Claim" was designated as the fifth class. It also defined the term "Liona Claim" to mean "the Claim, if any, of Liona in the amount and priority as determined by the Court by a Final Order." Moreover, the Reorganization Plan explicitly states that each designated creditor class, including administrative claims that are entitled to priority under Code section 507, is subject to reclassification. Specifically, the Reorganization Plan states that each class designation is established "except as otherwise provided by the Final Order of the Court with respect to the order and priority of the Liona Claim." Finally, the sale of the land and the Hotel could not have taken place without Liona's consent. No doubt this is the reason that the Reorganization Plan makes clear that all creditor claims are subject to the resolution of the Liona Claim. These terms are plainly the product of negotiations among the creditors as well as PCH and Liona. Now, PCH seeks to undermine the very substance of its own Reorganization Plan. We will not condone this. Accordingly, given the specific facts of this case, we hold that Liona's failure to file a proof of claim will not bar it from asserting a claim against the PCH estate.
 
 CONCLUSION
 
 103
 In sum, we hold that the agreements between Liona and PCH gave rise to a secured transaction which resulted in Liona's holding an equitable mortgage and not a joint venture. Accordingly, the judgment of the district court is vacated and the case is remanded for further action consistent with this opinion.
 
 
 
 [1]
 The factual background is explored in detail in the decision of Bankruptcy Judge Lifland. See In re PCH Assoc., 55 B.R. 273 (Bkrtcy.S.D.N.Y.1985)
 
 
 [2]
 The actual purchase price for the Hotel was $6 million. However, $1 million was paid as a fee to Fidinam. Thus, $5 million was the value of the actual funds that PCH received