**In re Gillian Louise STANLEY, Debtor.**

**Bankruptcy No. 93–53332.**

United States Bankruptcy Court,
D. Connecticut.

Aug. 22, 1995.

---

Ann M. VanDeventer, Zeldes, Needle & Cooper, P.C., Bridgeport, CT, for movants.

Mark M. Kratter, Carron & Fink, Westport, CT, for debtor.

## MEMORANDUM AND ORDER ON MOTION TO REOPEN AND VACATE ORDER DETERMINING VALUE OF SECURITY

ALAN H.W. SHIFF, Bankruptcy Judge.

James and Maria Jarusinsky move to reopen and vacate a June 9, 1994 order entered pursuant to § 506(a). That order fixed the value of certain real property encumbered by two liens securing debts owed to these movants and determined that their claims were wholly unsecured. Because of events subsequent to the entry of that order, I conclude that "it is no longer equitable that the [order] should have prospective application," or in the alternative, that extraordinary circumstances exist, *see* Rule 60(b)(5), (6) Fed. R.Civ.P., made applicable by Rule 9024 Fed. R.Bankr.P., and the motion is granted.

### BACKGROUND

This chapter 11 case was commenced on October 13, 1993.[1] On that date, the following liens encumbered the debtor's property at 49 Bronson Road, Prospect, Connecticut (the "Property"): [2]

---

1. Even though the Property (hereinafter defined) appears to be the debtor's principal residence, § 506(a) may operate to modify the rights of secured creditors because the Bankruptcy Reform Act of 1994, which amends § 1123(b) so as to preclude that result, is inapplicable in this chapter 11 case, which was commenced prior to the Act's effective date. *See Wade v. Bradford,* 39 F.3d 1126, 1128–30 (10th Cir.1994); *Dever v. Internal Revenue Serv. (In re Dever),* 164 B.R. 132, 145 (Bankr.C.D.Cal.1994) (lien stripping is permissible in chapter 11 cases); Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, 108 Stat. 4106, 4123, 4150, §§ 206, 702(b)(1) (1994).

2. Numerous discrepancies among the debtors' filings make it difficult to determine the precise lien structure on the Property and the amount secured by the liens. The sources for the stated amounts are as follows: Prospect tax liens (item no. 1), Shawmut first mortgage (item no. 2), Shawmut second mortgage (item no. 3), and Ford Motor Credit lien (item no. 6)—debtor's plans and disclosure statements; Austin third mortgage (item no. 4) (the debtor describes it as a judgment lien) and Jarusinsky fourth mortgage (item no. 5)—debtor's schedules and 506(a) Motion; Austin judgment lien (item no. 7)—movants' Objection to Confirmation of Plan filed January 19, 1995. The 506(a) Motion fails to reference the Town of Prospect tax liens (item no. 1); lists the Shawmut first mortgage (item no. 2) as $100,000; recognizes a $5,000 judgment lien in favor of the Naugatuck Savings Bank between

1. Tax liens in favor of the Town of Prospect ..... $11,496.96
2. First Mortgage to Shawmut Bank Connecticut, N.A. ..... 68,701.16
3. Second Mortgage, securing a guaranty by debtor's ex-husband to Shawmut Bank Connecticut, N.A. ..... 250,000.00
4. Third Mortgage to Warren J. Austin, assigned to James Jarusinsky ..... 40,000.00
5. Fourth Mortgage to James R. and Maria B. Jarusinsky ..... 66,697.64
6. Judgment Lien to Ford Motor Credit ..... 7,689.88
7. Judgment Lien to Warren Austin ..... 25,346.49

On February 25, 1994, the debtor filed a § 506(a) motion (the "506(a) Motion") which was served on James Jarusinsky and others.[3] The value of the Property was stated at $150,000.00. In the absence of objection, an order (the "506(a) Order") entered on June 9, 1994. The 506(a) Order stated: "The in rem claim of Jim Jarusinsk[y] as recorded in the Prospect Town Hall in Volume 168, Page 55 be and it hereby is, reduced to $0.00." Similar language was used with respect to the $40,000.00 third mortgage which was assigned to Jarusinsky. The 506(a) Order did not reference § 506(d) or otherwise state that the liens were void.[4]

On October 31, 1994, the debtor filed a plan and disclosure statement.[5] The plan provided that the Shawmut Bank second mortgage would continue to be a lien on the Property but that no payments would be made by the debtor because a third party was liable on the guaranty that the second mortgage secured. The disclosure statement stated that an entity known as Moldmasters, Inc., was primarily liable on the debt. The plan did not treat the movants' claims or most of the other claims that were determined to be unsecured by virtue of the 506(a) Order, because they were allegedly discharged in a previous chapter 7 case.[6] The plan proposed to treat only $4,349.27 in allowed unsecured claims in Class 5, all of which had arisen after the prior chapter 7 discharge.

On November 1, 1994, the clerk of this court mailed a notice to the debtor's counsel that a hearing on the disclosure statement would be held on December 5, 1994. The movants allege they never received notice of the hearing. *See* Rule 3017(a) Fed. R.Bankr.P. The debtor did not file a certification of service that creditors received notice of the disclosure statement hearing, and counsel for the debtor has no recollection as to whether the notice was mailed to creditors. *See* Stipulation of Facts Regarding Notice of Disclosure Statement Hearing, filed May 2, 1995. The movants further allege that on November 15, 1994, the Shawmut Bank second mortgage was paid in full by Mold Masters Tool & Design, Inc.[7] On

the Austin third mortgage (item no. 4) and the Jarusinsky fourth mortgage (item no. 5); fails to recognize the Austin judgment lien (item no. 7); and does not recognize the assignment of the Austin third mortgage to the movants, which apparently occurred after the 506(a) Motion was filed. However, those discrepancies are not material for the purposes of this Memorandum and Order because under either the debtor's or the movants' version, the movants' liens were wholly unsecured when the 506(a) Motion was filed, but became partially secured when the Shawmut second mortgage was satisfied, as described *infra*.

3. It does not appear that the movants filed a proof of claim for either of their two claims. However, both claims were scheduled and were not stated to be disputed, contingent, or unliquidated. *See* Schedule D, filed October 13, 1993. Both claims are therefore deemed filed even in the absence of a proof of claim. *See* § 1111(a); Rule 3003(c)(2) Fed.R.Bankr.P.

4. On August 30, 1994, the debtor filed another proposed order which conformed to this court's requirements for § 506(a) orders. That order would have bifurcated the Shawmut second mortgage and would have declared liens purporting to secure unsecured claims to be void. That order never entered.

5. On November 22, 1994, a hearing was held on the United States Trustee's motion to dismiss or convert. On November 23, 1994, an order entered establishing the following deadlines: Filing of plan and disclosure statement—January 17, 1995; approval of disclosure statement—February 17, 1995; order confirming a plan—March 17, 1995.

6. The plan proposed to pay in full the claim of Ford Motor Credit, which related to an automobile lease.

7. Although the debtor suggests that the Shawmut second mortgage has not actually been released of record from the Property, the debtor acknowledges that the debt secured by the mortgage has been paid in full. *See* Memorandum, filed March 24, 1995, at p. 2. Satisfaction of the mortgage of record is therefore a ministerial act which, presumably, will occur in due course. As the estate's fiduciary, the debtor has the duty to request the satisfaction and, if it is not forthcoming, to seek a declaration in this court that the mortgage is void and discharged of record.

December 6, 1994, an order entered approving the original disclosure statement.

On December 7, 1994, the debtor filed a first amended disclosure statement and plan. The amended documents made no reference to the alleged satisfaction of the Shawmut second mortgage on November 15, 1994; they described the loan as "payable" by Moldmasters, Inc., and provided that the "creditor shall continue to maintain its lien" on the Property.

On January 13, 1995, the movants filed the instant Motion to Reopen and Vacate Order Determining Value of Security, and on January 19, 1995, they filed an Objection to Confirmation of Plan.

## DISCUSSION

### I.  Relief From the 506(a) Order

The movants argue that changed circumstances, i.e. the payment of the debt secured by the Shawmut second mortgage, justify relief under Rule 60(b)(5) and (6) Fed.R.Civ. P., made applicable by Rule 9024 Fed. R.Bankr.P., which provide in relevant part:

> On motion and upon such terms as are just, the court may relieve a party ... from a final judgment, order, or proceeding for the following reasons:
>
> .    .    .    .    .
>
> (5) ... it is no longer equitable that the judgment should have prospective application; or
>
> (6) any other reason justifying relief from the operation of the judgment.[8]

▉ The standard to be applied in determining whether an order has prospective application within the meaning of Rule 60(b)(5) is whether it is executory or involves the supervision of changing conduct or conditions. *DeWeerth v. Baldinger*, 38 F.3d 1266, 1275 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 512, 130 L.Ed.2d 419 (1994); *Maraziti v. Thorpe*, 52 F.3d 252, 254 (9th Cir. 1995).  Judgments such as those under § 506(a) which, in the plan confirmation context, necessarily have a future application are

executory.  *See DeWeerth v. Baldinger, supra,* 38 F.3d at 1275.  Rule 60(b)(6) is

> "a grand reservoir of equitable power to do justice in a particular case when relief is not warranted by the preceding clauses." 7 Moore's Federal Practice ¶ 60.27[2], at 295 (2d ed. 1993).  In a proper case, it is to be "liberally applied." *Id.* at 273.  Nevertheless, relief under Rule 60(b)(6) is available only in "extraordinary circumstances." *Ackermann v. United States,* 340 U.S. 193, 199, 71 S.Ct. 209, 212, 95 L.Ed. 207 (1950).

*Transaero, Inc. v. La Fuerza Area Boliviana,* 24 F.3d 457, 461, *mod. on reh'g,* 38 F.3d 648 (2d Cir.1994).  Thus, that rule is properly invoked where there are extraordinary circumstances or where the judgment may work an extreme and undue hardship, *DeWeerth v. Baldinger, supra,* 38 F.3d at 1272, and where the other, more specific, subsections of Rule 60(b) are inapplicable, *Maduakolam v. Columbia Univ.,* 866 F.2d 53, 55 (2d Cir.1989).  A movant under Rule 60(b)(6) must be "faultless in [causing] the delay" in seeking relief from an order.  *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership,* —— U.S. ——, ——, 113 S.Ct. 1489, 1497, 123 L.Ed.2d 74 (1993).

▉ "Rule 60(b) applies only to final determinations and not to interlocutory orders." *Remington Prods., Inc. v. N. Am. Philips, Corp.,* 755 F.Supp. 52, 54 (D.Conn. 1991).  Although, under the law of the case doctrine, a court generally follows its prior interlocutory orders in a case, it may reconsider those orders where there has been an intervening change in the controlling law, new evidence, or the need to correct a clear error of law or to prevent manifest injustice. *Id.; see United States v. Adegbite,* 877 F.2d 174, 178 (2d Cir.), *cert. denied,* 493 U.S. 956, 110 S.Ct. 370, 107 L.Ed.2d 356 (1989).  That doctrine "is a discretionary rule of practice and generally does not limit a court's power to reconsider an issue." *Liona Corp., Inc. v. PCH Assocs. (In re PCH Assocs.),* 949 F.2d 585, 592 (2d Cir.1991).  In the context of appellate jurisdiction over bankruptcy court orders, the Second Circuit Court of Appeals

---

**8.**  The debtor does not dispute, and I conclude, that the movants filed the instant motion "within a reasonable time" as required by Rule 60(b).

*See Truskoski v. ESPN, Inc.,* 60 F.3d 74, 77 (2d Cir.1995).

has followed a flexible standard of finality under which an order is deemed final if it finally disposes of discrete disputes within the larger case. *Shimer v. Fugazy (In re Fugazy Express, Inc.)*, 982 F.2d 769, 775 (2d Cir.1992). A " 'dispute' ... means at least an entire claim on which relief may be granted." *Id.* at 775–76. *See Dicola v. Am. S.S. Owners Mut. Protection and Indem. Ass'n (In re Prudential Lines, Inc.)*, 59 F.3d 327 (2d Cir.1995). An order is final where all issues relating to the discrete claim, including those pertaining to the proper relief, have been resolved. *Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 3 F.3d 49, 53 (2d Cir.1993).

Arguably, the 506(a) Order disposed of a discrete dispute in that it determined the value of the Property and determined that the movants' claim was wholly unsecured. *Cf. Walsh Trucking Co., Inc. v. Ins. Co. of N. Am.*, 838 F.2d 698, 701 (3d Cir.1988) (order expunging claim was final); *In re Travelers Motor Inn, Inc.*, 181 B.R. 6, 7 (N.D.N.Y. 1995) (§ 506(a) valuation order made in conjunction with and for the purpose of plan confirmation is a final order); *Brandt v. R & D Trucking Co., Inc. (In re Lissner Corp.)*, 98 B.R. 812, 816–17 (N.D.Ill.1989) (order holding that claim was completely unsecured was final). The parties do not dispute that the 506(a) Order is a final order subject to reconsideration under Rule 60(b). For the purposes of this motion, I will assume that the 506(a) Order is sufficiently final as to warrant the application of the more rigorous Rule 60(b) standard rather than the law of the case standard.

## II. The Effect of Post–Petition Events Affecting a Claim's Secured Status

The substantive issue raised by the instant motion is whether, when a lien encumbering property of a chapter 11 estate is satisfied postpetition and after an order has entered under § 506(a) but prior to confirmation, the plan must account for that postpetition change in circumstances. That issue turns on the interplay between §§ 506(a), 1111(b),

and 1129(a)(7) and (b). The relevant portions of those statutes provide as follows:

Section 506(a):

An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

Section 1111(b):

(b)(1)(A) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless—

(i) The class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection; or

(ii) such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.

(B) A class of claims may not elect application of paragraph (2) of this subsection if—

(i) the interest on account of such claims of the holders of such claims in such property is of inconsequential value; or

(ii) the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan.

(2) If such an election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed.

Section 1129(a)(7):

(a) The court shall confirm a plan only if all of the following requirements are met:

.          .          .          .          .

(7) With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or

(B) if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

Section 1129(b):

(b)(1) [I]f all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court . . . shall confirm the plan notwithstanding the requirements of such paragraph if the plan . . . is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

.        .        .        .        .

(i)(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property. . . .

Having analyzed the foregoing code sections and the case law that interprets them, I conclude that the satisfaction of the Shawmut second mortgage subsequent to the entry of the 506(a) Order warrants the vacation of that order. I reach that conclusion because (i) the secured and unsecured status of claims must be determined as of a date on or in close proximity to the date of confirmation; (ii) the purpose of § 1111(b) may not be frustrated by a § 506(a) determination made prior to the time within which a § 1111(b)(2) election may be exercised; and (iii) equity requires the order's vacation.

### A. The Effective Date of a § 506(a) Determination

■ Both the structure of the code and applicable case law mandate that where a § 506(a) determination is made in conjunction with the confirmation of a chapter 11 plan, the resulting order must fix the rights of the parties as of the confirmation date of the plan.

### 1. The statutory structure

■ The second sentence of § 506(a) states that a valuation must be "determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." That sentence indicates that property may be valued at different times for different purposes. Were that not the case, that provision would serve no purpose. A § 506(a) valuation hearing may be held at any time during the pendency of a case. *See* Rule 3012 Fed.R.Bankr.P. Such a hearing may be conducted for several purposes, it being noted that § 506 is applicable to chapters 7, 11, 12, and 13, *see* § 103(a). For example, that section may used to determine chapter 13 eligibility, *see* § 109(e), to determine whether adequate protection payments should be required, *see* §§ 361, 362(d)(1), and, in a chapter 11 context, as here, to determine the value of a claim to be treated under a proposed plan. The purpose of the valuation dictates its timing. So, if the purpose is to determine chapter 13 eligibility, the valuation should be made as of the petition date, but where, as here, the purpose of the valuation is to determine the treatment of a claim by a plan, the values determined at the § 506(a) hearing must be compatible with

the values that will prevail on the confirmation date to avoid an inequitable result. For that reason, § 506(a) hearing should be timed so that they are in close proximity to confirmation hearings.

Section 1129 also supports that conclusion. That section refers in several locations to "the effective date of the plan," e.g., § 1129(a)(7)(A)(ii), (a)(7)(B), (b)(2)(A)(i)(II). Generally, that language refers to the date on which the property *to be distributed* under the plan must be valued, not the date on which the *secured claim* must be valued. That is, the property to be distributed under the plan must be valued as of the effective date of the plan, so that if it is distributed *after* the effective date of the plan, more property must be distributed in order to compensate the secured creditor for the delay. Those code sections support an inference that the secured claim should also be valued as of (or close to) the effective date of the plan. The discounting provision recognizes that the secured creditor's rights are fixed as of the plan's effective date, not as of the petition date. Further, § 1129(a)(7)(A)(ii) also requires that the secured creditor who does not elect § 1111(b)(2) treatment must receive "property of a value, as of the effective date of the plan, that is not less than the amount that such holder would ... receive or retain *if the debtor were liquidated under chapter 7 of this title on such date.*" By requiring the liquidation analysis as of the effective date of the plan, it is apparent that a creditor's right to a distribution is to be determined as of that date.

The debtor argues that the § 506(a) Order in combination with her prior chapter 7 discharge eliminated the movants' right to utilize the protection provided by § 1129. That argument fails because the § 506(a) Order was prospective and was not intended to disenfranchise a secured creditor whose lien is supported by equity on the effective date of the plan. The movants' secured claim has not been disallowed under § 502, and is entitled to recognition. Further, as discussed *infra,* both § 1111(b) and equitable considerations preclude the treatment the debtor proposes for the movants' claims.

Other code sections buttress that analysis. For example, an oversecured creditor may be entitled to post-petition interest and costs under § 506(b), and the plan must include those amounts. Section 541(a)(7) indicates that the estate may acquire interests in property after commencement of the case. Section 552(b) states that prepetition security interests may attach to certain proceeds acquired by the estate post-petition. Adequate protection payments are designed to compensate a secured creditor for any decline in the value of its collateral post-petition and preconfirmation. *See* § 361(1). Section 502(b)(1) requires that a claim be allowed after objection "as of the petition date," but does not suggest that the determination of secured status must always be made as of that date. All of those provisions suggest that the determination of what portion of a claim is secured under § 506(a) must be made as of the confirmation date, which is the date upon which the parties' rights become fixed. *See In re Bloomingdale Partners,* 155 B.R. 961, 976 (Bankr.N.D.Ill.1993); *In re Landing Assocs., Ltd.,* 122 B.R. 288, 293 (Bankr.W.D.Tex.1990).

A debtor may wish to file a § 506(a) motion in advance of the confirmation hearing to avoid the need to amend the plan in the event that the court finds that the value of the subject property is greater than the debtor contends. However, any order the debtor obtains on that motion should be subject to reconsideration based on a material preconfirmation change in circumstances which would render the order inequitable. "[W]hen an unforeseen event occurs after the valuation hearing but before the confirmation date which significantly affects the true value of the subject property, the bankruptcy court should take note of that event and conduct a new valuation hearing so as to insure the most equitable distribution of the property." *Beneficial Homeowner Serv. Corp. v. Moreau (In re Moreau),* 140 B.R. 943, 944 (N.D.N.Y.1992) (chapter 13); *accord In re Woolley's Parkway Center, Inc.,* 147 B.R. 996, 1002 (Bankr.M.D.Fla.1992) ("To accept the proposition that a valuation at the beginning of a case is cast in concrete and is the law of the case for all purposes not only

defies logic but is clearly contrary to the specific language of § 506 of the Code."); *cf. Palombo Farms of Colorado, Inc. v. Nat'l Acceptance Corp. of Am., Inc. (In re Palombo Farms of Colorado, Inc.)*, 43 B.R. 709, 711 (Bankr.D.Colo.1984) (valuation should await confirmation hearing under facts of that case).

I recognize that the "effective date" of a plan may be some time after the confirmation date, although it is clear that it should be in close proximity thereto, so that the values are not appreciably altered. In the instant case, for example, the effective date is the first day after the expiration of the period for an appeal of the confirmation order, or if an appeal is taken, the first day after all appeals have been exhausted. *See* First Amended Plan, filed December 7, 1994, at p. 2.[9] It is irrelevant which date controls in the instant case because the movants sought vacation of the 506(a) Order based on an event that occurred prior to the confirmation hearing.

### 2. The case law

In *Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), the Supreme Court determined that a lien could not be "stripped down" in a chapter 7 case through the use of § 506(a) and (d). The Court noted that "[a]ny increase over the judicially determined valuation during bankruptcy rightly accrues to the benefit of the creditor, not to the benefit of the debtor and not to the benefit of other unsecured creditors whose claims have been allowed and who had nothing to do with the mortgagor-mortgagee bargain." *Id.* at 417, 112 S.Ct. at 778. Although the *Dewsnup* holding was limited to chapter 7 cases, the "best interest of creditors" test under § 1129(a)(7) suggests that secured creditors should receive the benefit of any increase and suffer the detriment of any decrease in the value of their collateral in the chapter 11 context. *See In re Bloomingdale Partners*, 160 B.R. 93, 97 (Bankr. N.D.Ill.1993).

The majority of courts both before and after *Dewsnup* have held that for purposes of plan confirmation, collateral should be valued at or near the plan's confirmation or effective date. *See, e.g., Ahlers v. Norwest Bank Worthington (In re Ahlers)*, 794 F.2d 388, 398 (8th Cir.1986), *rev'd in part on other grounds*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988); *In re Union Meeting Partners*, 178 B.R. 664, 674 n. 7 (Bankr. E.D.Pa.1995) (value determined as of confirmation date); *In re Columbia Office Assocs. Ltd. Partnership*, 175 B.R. 199, 202 (Bankr. D.Md.1994) (value determined as of effective date of plan); *Matter of Atlanta Southern Business Park, Ltd.*, 173 B.R. 444, 450 (Bankr.N.D.Ga.1994); *Dever v. Internal Revenue Serv. (In re Dever)*, 164 B.R. 132, 145 (Bankr.C.D.Cal.1994) ("Chapter 11 expressly contemplates the stripping down of liens to the value of the collateral at the effective date of the plan...."); *Schreiber v. United States (In re Schreiber)*, 163 B.R. 327, 332 (Bankr.N.D.Ill.1994); *In re Melgar Enters., Inc.*, 151 B.R. 34, 39 (Bankr.E.D.N.Y.1993); *Matter of Savannah Gardens–Oaktree*, 146 B.R. 306, 308 (Bankr.S.D.Ga.1992); *Matter of Seip*, 116 B.R. 709, 711 (Bankr.D.Neb.1990); 3 L. King, ed., COLLIER ON BANKRUPTCY ¶ 506.04[2] at pp. 506–37—506–38 (15th ed. 1995); *cf. In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1016 (Bankr.S.D.N.Y.) ("[F]or purposes of the section 1111 election (as with other reorganization plan issues), the collateralized property should be valued as of, or close to, the effective date of the plan...."), *aff'd*, Case. No. 93 CIV 844 (LJF), 1993 WL 316183 (S.D.N.Y., May 21, 1993); *but see, e.g., In re Beard*, 108 B.R. 322 (Bankr. N.D.Ala.1989).

Having concluded that the § 506(a) determination must be made as of the time of confirmation, the movants are entitled to relief from the 506(a) Order because there has been a material change in the lien structure on the Property after that order but before confirmation.

---

**9.** Where the effective date is tied to an appeal period, and an appeal is taken, it could be argued that the confirmation date should control where no stay pending appeal is granted, and the effective date should control if the stay is granted. The relevant determination should be when the rights of the parties have been fixed.

## B. The purpose of § 1111(b)

█ Relief from the 506(a) Order is also warranted because a contrary holding would thwart the purpose of § 1111(b).

The impetus behind Congress's enactment of § 1111(b) was to protect the rights of nonrecourse lienholders in Chapter 11 reorganizations. Specifically, in reorganizations where the debtor elects to retain the collateral property, the absence of a public sale would preclude the lienholder from bidding on the property and thereby realizing the value of its lien, and the nonrecourse nature of the debt would leave the lender without a claim for the deficiency. If the property is valued by the bankruptcy court and effectively "sold" to the debtor outright at the valuation price, the worth of the undersecured lien is reduced to the current market value of the property, and, unlike the situation where he can be a successful bidder, the lienholder is unable to benefit from any unanticipated post-valuation appreciation. In addition, if the lienholder's deficiency claim is not allowed, his participation in the bankruptcy will likewise be limited to the market value of his lien, and the debtor will more likely be able to "cram down" a plan that is unfavorable to the lienholder.

Section 1111(b) therefore implements a general rule that a claim secured by a lien on property of the estate is to be treated as giving the lienholder recourse against the debtor, whether or not recourse exists under applicable non-bankruptcy law. The statute thereby puts the Chapter 11 debtor who wishes to retain collateral property in the same position as a person who purchased property "subject to" a mortgage lien would face in the non-bankruptcy context. Outside of bankruptcy, if the owner wanted to retain the property after the mortgage went into default it would either have to work out a satisfactory resolution of the mortgage with the lender or bid on the property at a public foreclosure sale. Section 1111(b) puts Chapter 11 debtors to the same choice of either paying off the debt or forfeiting the property, and thereby allows the debtor to retain the property and effectuate its reorganization, but without frustrating the lienholder's rights. By giving the lienholder recourse against the debtor personally for the amount of any deficiency, § 1111(b) provides the lienholder the benefit it would otherwise obtain from its nonrecourse loan bargain—i.e., either full payment (or at least a claim against the estate for the full amount of the debt and the ability to vote on the plan to the extent of its claim), or the right to foreclose and bid on the property at public auction.

*680 Fifth Ave. Assocs. v. Mut. Benefit Life Ins. Co. in Rehabilitation (In re 680 Fifth Ave. Assocs.),* 29 F.3d 95, 97–98 (2d Cir.1994) (citations omitted). *See also In re Constitution Plaza Assocs. Ltd. Partnership,* 161 B.R. 563, 565 (Bankr.D.Conn.1993); *In re Broad Assocs. Ltd. Partnership,* 125 B.R. 707, 711–12 (Bankr.D.Conn.1991).

█ A threshold issue here is whether § 1111(b)(1)(A), which provides that a claim is entitled to recourse in a chapter 11 case even though it would not be entitled to such treatment under nonbankruptcy law, applies to the movants' claim notwithstanding the debtor's prior chapter 7 discharge. I conclude that it does. The only requirement for the application of that subsection is that there be a "claim secured by a lien on property of the estate." *See In re Claremont Towers Co.,* 175 B.R. 157, 164 (Bankr.D.N.J. 1994) (a creditor who failed to file a timely proof of claim and thus held no "allowed secured claim" nevertheless held a "claim secured by a lien" and was entitled to make a § 1111(b) election). The terminology "claim secured by a lien" is consistently used in the code to refer to a claim that purports to be secured by property of the estate, irrespective of whether there is actually value in the property to support the claim. *See In re Hornes,* 160 B.R. 709, 714 (Bankr.D.Conn. 1993).

At the inception of this case, the movants held a claim secured by a lien, and were thus entitled to treatment as though they were recourse creditors under § 1111(b)(1)(A). In that respect, the movants' claim was no different from a claim that lacked recourse because of an agreement or applicable state law. In *Johnson v. Home State Bank,* 501

U.S. 78, 86, 111 S.Ct. 2150, 2155, 115 L.Ed.2d 66 (1991), the Supreme Court held that "[i]nsofar as the mortgage interest that passes through a Chapter 7 liquidation is enforceable only against the debtor's property, this interest has the same properties as a nonrecourse loan." The Court held that § 102(2), which defines the term "claim against the debtor" to include "claim against property of the debtor," was intended by Congress to provide that the term "claim" "extend to all interests having the relevant attributes of nonrecourse obligations *regardless of how these interests come into existence.*" *Id.* at 86–87, 111 S.Ct. at 2155–56 (emphasis added); *see United States v. Conston, Inc. (In re Conston, Inc.),* 181 B.R. 769, 773 (D.Del.1995) (discharged tax claims could retain priority characteristics even though they were not enforceable against the debtor under § 524). In the absence of § 1111(b), a claim that is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law," must be disallowed pursuant to § 502(b)(1). "During a Chapter 11 reorganization, however, the strict requirements of section 502(b)(1) are rendered inapplicable in limited circumstances" by § 1111(b). *In re PCH Assocs., supra,* 949 F.2d at 604. The Second Circuit has held that a nonrecourse claim is within § 1111(b) even where there is no privity between the debtor and the creditor, as where the debtor acquired property "subject to" a mortgage without assuming it. *In re 680 Fifth Ave. Assocs., supra,* 29 F.3d at 98. The movants' nonrecourse claim therefore must be treated as though it were recourse unless the movants are entitled to and make the § 1111(b) election.

The debtor argues that even if the movants could have claimed the protection of § 1111(b) at the inception of this case, the 506(a) Order has stripped the movants of that right. She contends that because § 506(a) and (d) have the effect of voiding the movants' lien, the movants are not entitled to recourse treatment under § 1111(b)(1)(A). She further contends that because the movants may not elect treatment as a fully secured claim under § 1111(b)(2) if their interest in estate property is of "inconsequential value," *see* § 1111(b)(1)(B)(i), the

506(a) Order deprived the movants of the right to make the election.

I disagree. Section 506(a) was not intended to be used to deprive a nonrecourse creditor of either the automatic right to recourse treatment granted by § 1111(b)(1)(A) or of the right to elect to have its claim treated as a fully secured claim pursuant to § 1111(b)(2). Section 1111(b)(2) provides that if an election is made, "then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed." Had the movants made a § 1111(b) election, the debtor could not have used § 506(a) to strip their lien. Rule 3014 Fed.R.Bankr.P. provides that an election "may be made at any time prior to the conclusion of the hearing on the disclosure statement or within such later time as the court may fix." The disclosure statement hearing was selected as the usual deadline for making the election because the electing class "must know the prospects of its treatment under the plan before it can intelligently determine its rights under § 1111(b)." Advisory Committee Note (1983). Further, Rule 9006(c)(2) Fed.R.Bankr.P. expressly prohibits the court from reducing the time period allowed for making the election under Rule 3014. Construing those statutes and rules together so as to give full effect to each, it is apparent that a § 506(a) determination made in advance of the disclosure statement hearing cannot cut off a creditor's right to make a § 1111(b) election. To conclude otherwise would allow a debtor to defeat a nonrecourse creditor's right to make the election by filing and prosecuting a § 506(a) motion soon after commencement of the case. Here, the movants could not intelligently analyze their options under § 1111(b) when the § 506(a) Motion was prosecuted, because those options changed significantly after that time period, but before any disclosure statement hearing was held.

Further, the starting point of a § 506(a) determination is an "allowed" claim. *See Piedmont Trust Bank v. Linkous (In re Linkous),* 141 B.R. 890, 895 (W.D.Va.1992) ("Allowance as a prerequisite to invoking § 506(a) is ... widely recognized."), *aff'd,* 990 F.2d 160 (4th Cir.1993). Section

1111(b)(1)(A) and (2) state that a claim "shall be allowed or disallowed" as though the holder had recourse, unless the holder elects treatment as fully secured, in which event the claim is deemed secured to the extent allowed, "notwithstanding section 506(a)." Because § 1111(b) deals with the manner in which a claim must be allowed or disallowed in the first instance and § 506(a) deals with the classification of the resulting allowed claim as secured or unsecured, it is apparent that § 1111(b) takes precedence over or in effect operates as a predicate for § 506(a). Where a § 506(a) motion is made prior to the time a creditor elects § 1111(b)(2) treatment, that procedural happenstance cannot alter the creditor's substantive rights under § 1111(b). Regardless of which statute is invoked first in the temporal sense, § 1111(b) must always operate prior to § 506(a) in the conceptual sense.

As to the argument that a creditor cannot make a § 1111(b) election if its interest is of "inconsequential value" under § 1111(b)(1)(B)(i), it is observed that that subsection does not specify when the determination of inconsequential value must be made. The purpose of § 1111(b) is to determine the treatment which must be afforded a claim that is secured by a lien on property of the estate. Section 1129(a)(7)(B) expressly refers to § 1111(b)(2). It is therefore appropriate that, where a claim is not of inconsequential value on the date of the § 1111(b)(2) election, that election will be effective for the purpose of determining required treatment under the plan.

Moreover, even assuming that the movants' lien was of inconsequential value, that would only prevent the movants, as unsecured, nonrecourse creditors, from making the § 1111(b)(2) election. It would not prevent the movants' claim from automatically receiving recourse status pursuant to § 1111(b)(1)(A), which operates in the absence of an election. *See In re 500 Fifth Ave. Assocs., supra,* 148 B.R. at 1016–17; *In re Rosage,* 82 B.R. 389, 391 (Bankr.W.D.Pa. 1987); *In re Baxley,* 72 B.R. 195, 198–99 (Bankr.D.S.C.1986). "Section 1111(b)(1)(A) has eliminated in chapter 11 the legal distinction between nonrecourse deficiency claims and other unsecured claims." *In re 500 Fifth Ave. Assocs., supra,* 148 B.R. at 1019. Because § 506(a) and (d) operate only *after* allowance under §§ 502 and 1111(b), the fact that no value exists to support a claim secured by a lien could not affect its entitlement to § 1111(b)(1)(A) recourse treatment. The instant plan and disclosure statement, which do not treat the movants' claims at all, could therefore not in any event be confirmed. *Accord In re Atlanta West VI,* 91 B.R. 620, 624 (Bankr.N.D.Ga.1988) ("It is the existence of a 'lien' on estate property that triggers the recourse right under Section 1111(b)(1), not the existence of value to secure it."); *but see In re SM 104 Ltd.,* 160 B.R. 202, 215–16 (Bankr.S.D.Fla.1993).

A disclosure statement hearing was held on December 5, 1994. Rule 3014 Fed. R.Bankr.P. would generally preclude the movants from making a § 1111(b) election at this juncture. It does not in this case because the rule permits the court to fix a later time, and it is appropriate for the court to exercise that authority under the facts of this proceeding. More to the point, the movants allege and the debtor does not dispute that the movants received no notice of that hearing. Indeed, the debtor's counsel is unable to certify that *any* creditors received notice. Further, the movants correctly argue that the approved disclosure statement contains material misstatements in that it represents that the Moldmasters lien continues to encumber the Property, when it did not at the time the disclosure statement was approved, nor does it now. Under those circumstances, the disclosure statement hearing should be renoticed and the time for making a § 1111(b) election extended accordingly. *Cf. In re Bloomingdale Partners, supra,* 155 B.R. at 971 ("A creditor cannot be required to state its election before the end of the hearing on the adequacy of the disclosure statement. Therefore, it is ... appropriate to permit withdrawal of an § 1111(b) election when the disclosure statement is materially inadequate....").

I accordingly conclude that vacation of the 506(a) Order is required, so that the purpose and intent of § 1111(b) will not be frustrated in this case.

## C. The Equities

Both Rule 60(b)(5) and Rule 60(b)(6) require that this court consider the equities of granting relief from an order. The debtor argues that vacating the 506(a) Order is inequitable. She contends that the movants bargained for a subordinate lien position which was not supported at that time by any equity in the Property. Apart from the debtor's failure to offer any proof of that assertion, it nonetheless follows that when the movants bargained for a lien on the Property, they clearly intended to have the advantage of any equity that might develop in the future due to a change in market conditions or the satisfaction of a prior lien. Now that the latter eventuality has occurred, they seek only the benefit of that bargain. Obviously that bargain did not include the debtor's subsequent discharge of her personal liability on their debts followed by a § 506(a) and (d) elimination of their remaining rights in a subsequent chapter 11 case and an attempt to nullify their § 1111(b) rights. That treatment would put the movants in a worse position than post-discharge unsecured creditors, who never bargained for security, even though the movants' *in rem* lien rights survived the chapter 7 discharge. While serial filings are not *per se* prohibited, successive chapter 7 and 11 cases were not intended to achieve such a manifestly unjust result.

The debtor next urges that the reopening of the § 506(a) Order will work to the disadvantage of the small amount of post-chapter 7 discharge claims in this case. That argument ignores the fact that the movants, as secured creditors, are entitled to preferential treatment under the code. *Dewsnup v. Timm, supra*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903, teaches that the rights of lienholders to retain their liens cannot be affected in a chapter 7 case, yet here the debtor proposes to achieve that result through successive filings. If the § 506(a) Order is not reopened, because of the small amount of the post-chapter 7 discharge claims that the debtor proposes to pay, the debtor would retain substantial equity in the Property in preference to secured creditors, the validity of whose liens are not challenged. As a fiduciary of this estate, the debtor should seek to distribute the newly created equity in the Property to her creditors, secured and unsecured, rather than attempt to manipulate the code through serial filings so as to seize the equity for herself.[10] I also agree with the movants' contention that vacation of the 506(a) Order will be equitable in the event this case is converted. *See* Memorandum, filed March 27, 1995, at p. 9. *Dewsnup* would prohibit the use of § 506(d) to void the movants' lien in a chapter 7 case.

The equities here are similar to those in *In re O'Leary*, 183 B.R. 338 (Bankr.D.Mass. 1995), where a debtor filed a § 506(a) motion and the resulting order determined a second mortgage to be completely unsecured. The debtor then negotiated a reduced prepayment of the first mortgage under certain conditions. The second mortgagee then tried to make the § 1111(b) election notwithstanding that the § 506(a) order had determined that its claim was unsecured. The court found that the debtor was trying to "whipsaw" the second mortgagee by capturing the value created by the possible reduction in the amount secured by the first mortgage. The court found the plan not to be fair and equitable because it did not propose to distribute any recaptured equity to the class of unsecured creditors, which included the second mortgagee.[11]

10. The equity freed by the payoff of the Shawmut second mortgage is not property acquired by the estate under § 541(a)(7), nor property preserved for the estate's benefit under §§ 551 and 552. The Shawmut lien was not voided for the estate's benefit under any of the sections referenced in § 551. There is therefore nothing to prevent the movant's liens from attaching to the freed equity.

11. In *O'Leary*, it would not have been appropriate for the court to vacate the § 506(a) order because the order remained correct as entered. The first mortgage still secured the amount contemplated by the § 506(a) order on the effective date of the plan; only in the event of a postconfirmation satisfaction or refinancing of the loan debt within two years would the amount secured by the first mortgage be reduced. Further, the second mortgagee held a completely unsecured claim through the confirmation date of the plan, and so could not have made the § 1111(b)(2) election pursuant to § 1111(b)(1)(B)(i). The *O'Leary* court nevertheless recognized the fundamental inequity in permitting the debtor to potentially capture equity when the unsecured creditors were not paid in

Finally, the debtor suggests that Jarusinsky was a principal of the predecessor in interest to the corporation which was primarily liable on the debt secured by the satisfied mortgage. It also appears that Jarusinsky received an assignment of the Austin third mortgage on November 18, 1994, which is about the same time that the Shawmut second mortgage was satisfied. *See* Objection to Confirmation of Plan, filed January 19, 1995, p. 2.[12] The implication is that the movants were in a position to cause the payoff of the Shawmut second mortgage so as to achieve an advantage as the holders of subordinate secured claims and thereby maximize their distribution in the confirmation process.

The debtor presented no evidence of any improper motive on the part of either of the movants. In the related context of designating a ballot as having been cast in bad faith under § 1126(e), courts will generally find bad faith only where there is evidence that the creditor has acquired a claim for an improper purpose. Such purposes could include exacting preferential treatment for the creditor's claim over those of other creditors in its class or securing an advantage to which it would not otherwise have been entitled, e.g., seeking to take control of a corporate debtor or seeking to use insider information to the detriment of other creditors. *In re Dune Deck Owners Corp.*, 175 B.R. 839, 844 (Bankr.S.D.N.Y.1995); *In re Kovalchick*, 175 B.R. 863, 875 (Bankr.E.D.Pa.1994); *Comm. of Creditors Holding Unsecured Claims v. Citicorp Venture Capital, Ltd. (In re Papercraft Corp.)*, 165 B.R. 980, 991–92 (Bankr. W.D.Pa.1994) (insider of debtor could not purchase claims at discount without making

full disclosure to debtor and sellers of claims). The code does not prohibit a creditor from acting to maximize its recovery. *In re Dune Deck Owners Corp., supra,* 175 B.R. at 844; *In re Kovalchick, supra,* 175 B.R. at 875; *In re Pleasant Hill Partners, L.P.,* 163 B.R. 388, 395 (Bankr.N.D.Ga.1994) (secured creditor's purchase of controlling amount of unsecured claims in order to block plan confirmation did not constitute improper solicitation under § 1125(b) or bad faith under § 1126(e)); *see generally* J. Conti, R. Kozlowski, and L. Ferleger, *Claims Trafficking in Chapter 11—Has the Pendulum Swung Too Far?,* 9 BANKR.DEV.J. 281 (1992). There is no evidence here that the movants were motivated by any purpose other than to protect their claims.

### ORDER

For the foregoing reasons, I conclude that the movants are entitled to relief from this court's June 9, 1994 § 506(a) Order pursuant to Rule 60(b)(5), or in the alternative, pursuant to Rule 60(b)(6), Fed.R.Civ.P. Accordingly, it is

ORDERED that the § 506(a) Order is VACATED, without prejudice to the debtor's rights to (i) commence another proceeding under that subsection and (ii) file a new plan and disclosure statement which treat the movants' claims in a manner consistent with this Memorandum, any future § 506(a) determination, and any valid election pursuant to § 1111(b)(2).

---

full. Indeed, the equities are even more compelling in the instant case than in *O'Leary,* because the *O'Leary* debtor created the potential equity through successful negotiations with the first mortgagee, while in the instant case, the debtor seeks to take advantage of the windfall satisfaction of the prior lien.

12. If a claim is transferred other than for security before a proof of claim has been filed, the transferee need give no notice of the transfer. Rule 3001(e)(1) Fed.R.Bankr.P. If the transfer occurs after filing of the proof of claim, notice of the transfer must be filed and the transferor may file an objection. Rule 3001(e)(2) Fed.

R.Bankr.P. Some courts would read Rule 3001(e)(2) to require that notice of a transfer be given where, as here, the proof of claim is deemed filed, but not actually filed, pursuant to § 1111(a). *See In re Zaleha,* 162 B.R. 309, 314 n. 5 (Bankr.D.Idaho 1993). I do not address the issue of whether the movants should have filed notice of the claim transfer, because the debtor has not raised it, and because the movants in any event have standing to seek the vacation of the 506(a) Order both by virtue of the fourth mortgage claim which they did not purchase and by virtue of the third mortgage claim which they claim to have purchased. *See id.* at 314–15.